Jury found a verdict for plaintiff of $3,850.

---

(54 Misc. 337)

PEOPLE ex rel. BROOKLYN CHILDREN'S AID SOCIETY v. HENDRICKSON et al.

(Supreme Court, Special Term, Nassau County. April, 1907.)

1. DOMICILE—DEFINITION.

"Domicile" denotes the actual or constructive presence of a person in a given place, coupled with an intention to remain there permanently.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 17, Domicile, § 1.]

2. SCHOOLS AND SCHOOL DISTRICTS—PUBLIC—PUPILS—RESIDENCE.

Consolidated School Law, Laws 1894, p. 1225, c. 556, tit. 7, § 36, provides that the common schools shall be free to all persons of certain age, "residing in the district." Held that, where an orphan child had been placed by a society in the home of a resident of a school district under an arrangement whereby the society paid for his board and clothing, he was entitled to school privileges as a resident, though there was no arrangement as to the term of his abode in the district; the well-recognized policy of the state relating to education, as expressed in Const. art. 9, § 1, School Law, tit. 7, §§ 11, 59, 60, and Compulsory Education Law, Laws 1894, pp. 1682, 1687, c. 671, §§ 2, 13, making it obvious that it was not the legislative intent to employ the word "residence," as used in the school law, in the narrow sense of "domicile."

3. MANDAMUS—PARTIES—DEFENDANT—PUBLIC BOARD.

Since, under Code Civ. Proc. § 2071, service of an alternative writ of mandamus may be made upon a board of education by service upon a majority of the members or its presiding officer; that two members of a board were succeeded by new members after the commencement of a proceeding to compel the board to permit a child to attend school, and the relator failed to continue the proceeding against the new members, was not fatal to the proceeding; service of the alternative writ having been made upon a majority of the board as constituted after the election, including the president, and the return not pleading the election of the new officers in abatement.

Application by the people of the state of New York, on the relation of the Brooklyn Children's Aid Society, for a writ of mandamus against George C. Hendrickson and others. Peremptory writ granted.

This case was tried before a court without a jury upon issues raised by an alternative writ of mandamus and the return thereto. In March, 1906, the relator, the Brooklyn Children's Aid Society obtained an order requiring defendants to show cause why a peremptory writ of mandamus should not issue against them. The defendants having filed an affidavit denying some of the

material facts in relator's petition, an order was made directing that the alternative writ issue. The alternative writ recites that defendants, George C. Hendrickson, Harry H. Funnell, Ansell B. Gildersleeve, A. L. Field, and George F. Barr, comprising the board of education of the Huntington Union School, have refused to allow Howard Wisbauer, a resident of said school district and a ward of the relator, to attend said school without charge or compensation, and it commands defendants to allow Wisbauer, as a resident of said school district of school age, to attend said school without charge or compensation, in accordance with the statute in such cases, or that defendants show cause why the command of the writ should not be obeyed. In their return to the writ the defendants in substance allege that Wisbauer was not a resident of the Huntington Union free school district, but was a resident of the borough of Brooklyn, New York City. The defendants also set up the objection that the alternative writ was against them individually, and not against them in their official capacity as a board of education.

William G. Cook and Howard O. Wood, for relator.
Thomas Youngs, for defendants.

SCUDDER, J.  In 1866, the relator, the Brooklyn Children's Aid Society, was incorporated as a charitable organization under the general act of 1848.  Its certificate of incorporation states that it was incorporated "for the purpose of establishing one or more homes or lodging houses for children in the city of Brooklyn," and that:

"The particular business and object of the society shall be the protection, care, and shelter of friendless and vagrant youth, furnishing them with food and raiment and lodging, and aiding and administering to their wants, providing them with occupation, instructing them in moral religious truth and in the rudiments of education, and with such means as the society can properly employ endeavoring to make them virtuous and useful citizens."

The certificate further states that the place of business and principal office of the society should be located in the city of Brooklyn, Kings county, N. Y.  It appears from the evidence that the maintenance of homes or lodging houses for poor children in Brooklyn or elsewhere was abandoned by the society prior to the year 1902.  The manner in which it now exercises its benevolent and charitable purposes is by the placing of friendless or orphan children in private homes all over Long Island as members of families.

One Howard Wisbauer, in March, 1902, at the age of six years, was left an orphan by the death of his mother; his father having previously died.  His parents lived and died in Brooklyn.  He was born in that city and continuously lived there until the death of his mother. Within a few days after the death of his mother, an older brother delivered him into the care of the Brooklyn Children's Aid Society, and he has since that time been subject to its supervision and direction. The society did not immediately succeed in placing him in satisfactory surroundings, and after several changes finally, in October, 1905, placed him in the home of Mrs. Carrie Place, in the village of Huntington, where he has ever since remained.  By its arrangement with Mrs. Place, the society paid her $1.75 per week for the boy's board; also paid for his clothing.  There was no arrangement as to the term of his abode with Mrs. Place, and the arrangement could be terminated at any time by either party to it.  It may be inferred, however, from the fact that the boy remained with Mrs. Place for a considerable time, and from the parental attitude she has assumed toward him, that his

abode with her is likely to be of a permanent character. Wisbauer seems to have been treated as a member of Mrs. Place's family; she exercising parental care over his welfare, and he rendering her such services as a child might render a parent. Mrs. Place resides in Huntington free school district No. 3, of the town of Huntington, Suffolk county, N. Y. The board of education of that school refuses to allow Wisbauer to attend school without charge for his tuition, on the ground that he is not a person "residing in the district," within the meaning of section 36 of title 7 of the consolidated school law (Laws 1894, p. 1225, c. 556).

The section of the consolidated school law referred to provides as follows:

"Common schools in the several school districts of this state shall be free to all persons over five and under twenty-one years of age, residing in the district as hereinafter provided; but nonresidents of a district, if otherwise competent, may be admitted into the school of a district with the written consent of the trustees, or a majority of them, upon such terms as the trustees shall prescribe."

In considering this case upon its merits, a determination of the meaning of the words "residing in the district," as used in this section of the school law, is required, and aid in solving this question of statutory construction may properly be sought by reference to the well-recognized public policy of this state relating to education, and to the whole of the statute of which the above section forms a part. It need hardly be said that public policy has recognized that it is to the interest of the state to have all the children educated, in order that they may become good citizens. Ignorance and vice go hand in hand. Public welfare requires that every child shall have an opportunity to attend school. It has been well said:

"Our common schools are not confined to any class—are open to all. The trustees have no power to admit or reject pupils arbitrarily. They have no authority to make rules and regulations fixing a standard of admission for members. They are bound to instruct all the children who present themselves, without regard to their social relations, their station in life, or their religious faith. The spirit of our institutions on this point was embodied in the first section of the act of 1849 [Laws 1849, p. 192, c. 140] which declared that 'common schools shall be free to all persons residing in the district over 5 and under 21 years of age.' The word 'common,' as applied to our schools, bears the broadest and most comprehensive signification. It is equivalent to public, universal, open to all; for such is their character, subject only to such general statutory regulations as are prescribed by the Legislature. They are common to children in the sense that public highways are common to all persons who may choose to ride or drive thereon, observing only the law of the road. Thus they have been treated by the Legislature in the various enactments on the subject." People v. Board of Education of Brooklyn, 13 Barb. 400, 410.

The long-recognized public policy of this state has been embodied in the latest Constitution. Article 9, § 1, thereof provides:

"The Legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."

The right of a child of this state to receive free education has thus become a constitutional right. It is probably true that Wisbauer did not have a domicile in the Huntington Union school district in the technical meaning of that term. Domicile in that sense is the actual

or constructive presence of a person in a given place, coupled with the intention to remain there permanently.  A minor cannot exercise an independent intent in this matter.  A minor can have no domicile other than that of a parent or guardian, and, where both 'parents are dead, the domicile of the minor continues to be that of the last surviving parent.  To construe the word "residence," as used in the school law, as synonymous with the word "domicile," and to give to it the narrow and technical meaning of the latter word, would seriously impair the usefulness of that law, and would defeat various provisions of the statute.  A recital of the various provisions of the school law in which the residence of children is referred to makes it obvious that it was not the legislative intent to employ it in the narrow sense of domicile.

In prescribing the qualifications of voters at annual school meetings, section 11 of title 7 of the school law, among other things, provides:

"Every such person, not being a parent, who shall have permanently residing with him or her a child or children of school age, some one or more of whom shall have attended the district school in said district for a period of at least eight weeks within one year preceding such school meeting," etc., shall be entitled to vote.

Section 36, tit. 7, previously referred to, provides:

"Common schools in the several school districts of this state shall be free to all persons over five and under twenty-one years of age, residing in the district" as hereinafter provided."

Section 59, tit. 7, provides:

"The trustees of each school district shall on the first day of August in each year make to the school commissioners a report in writing for the year ending July 31st preceding, * * * and every such report shall certify: * * * (4) The number of children residing in the district on the 30th day of June previous to the making of such report, and the names of the parent or other persons with whom such children did respectively reside, and the number of children residing with each."

Section 60, tit. 7, provides:

"The annual reports of trustees of school districts of children residing in their district shall include all over five and under twenty-one years of age who shall have been on the 30th day of June last preceding the date of such report actually in the district comprising a part of the family of their parents or guardians or employers, if such parents, guardians or employers resided at the time in such district, although such residence was temporary; but such report shall not include children belonging to the family of any person who shall be an inhabitant of any other district in this state in which such children may by law be included in the report of its trustees."

Section 13 of the compulsory education law (Laws 1894, p. 1687, c. 671) provides that said act shall be known as "Title 16" of the consolidated school law.

Section 2 of the compulsory education law, among other definitions, gives the following:

"The term 'persons in parental relation to a child' includes the parent, guardians or other persons, whether one or more, lawfully having the care, custody or control of such child."

This statute also requires every child between the ages of 8 and 16, in proper physical and mental condition, to attend school, and directs

"every person in parental relation" to such child to cause the child to attend school. All through these sections it is apparent that the Legislature refers to the actual residence of the child, and not to its domicile, which by legal fiction is dependent on that of its parents. The duty of one standing in "parental relation" to a child to send it to school, and the duty of the district to furnish instruction, is made to depend on the actual residence of the child, no matter where the legal domicile of the parents may be. All distinction between domicile and actual residence is carefully excluded. It is evident that the statute was designed to meet the changes in family life which inevitably occur from time to time. Families are broken up and scattered by the necessities of obtaining a livelihood, by death of one or both parents, or by abandonment of offspring. Such children, as all others, are wards of the state to the extent of providing for their education. To secure these ends the law relating to public schools must be interpreted. Their dominant purpose is that all the children of the state shall have an opportunity for free education, and the language of the statute in relation to residence is to be construed with this purpose in view, rather than in the narrower spirit in which such expressions occur in statutes which relate to voting and administrations of estates.

The relator found a home for his orphan child in the village of Huntington, where he could have proper surroundings and could receive parental care. It was because of these considerations that he was sent there, and not for the purpose of enabling him to attend the Huntington school, in evasion of the school law. The child had no other home or residence. Under these circumstances he is entitled to receive a free education in the "common" school of the district in which he actually resides. Similar views to those above expressed have been enunciated by the courts of our sister states in the following cases: State v. Thayer, 74 Wis. 48, 41 N. W. 1014; Yale v. West Middle School District, 59 Conn. 489, 22 Atl. 295, 13 L. R. A. 161; School District v. Pollard, 55 N. H. 503; School District v. Bragdon, 23 N. H. 507.

It seems to have been the understanding of the parties that the issues should be tried and disposed of upon the merits. The attorney for the defendants in his brief expressly states that he does not insist on the objection set up in the return that the alternative writ is directed to the defendants individually, and not to them as constituting the board of education. The attorney for the defendants does, however, in his brief, seek to raise the objection that since the commencement of these proceedings the term of office of the defendants Gildersleeve and Barr had expired, and that at the annual school meeting in August 1906, two new trustees, named Pettit and Latham, respectively, were elected in their places, and that the failure of the relator to continue the proceeding against the new officers so elected was fatal to it. The board of Education of the Huntington Union School is a corporation (Consolidated School Law, Laws 1894, p. 1248, c. 556, tit. 8, § 7), and it must sue and be sued as such (Bassett v. Fish, 75 N. Y. 303). It is well established, however, that a writ of mandamus lies to the officer, board, or other organ of the corporation whose legal duty it

is to perform the required act.  People v. Common Council, 42 N. Y. 81;  People v. Brinkerhoff, 68 N. Y. 259.

Service of the alternative writ could be made on the board as such by service upon a majority of the members, or upon its presiding officer.  Code Civ. Proc. § 2071.  Service of the writ in this case was made on the majority of the board as now constituted, including its president.  The alternative writ was issued after the election of the two new trustees, and the return thereto does not set up their election in abatement.  The obligation sought to be enforced devolved on no particular set of trustees, constituting the board.  The right of Wisbauer to attend the Huntington Union School was not affected by the election of the two new trustees.  It continues to be the duty of the board as now constituted to permit him to attend the school, and the peremptory writ may be directed to and enforced upon the trustees constituting such board generally.  "To say otherwise would be a sacrifice of substance to mere form."  People ex rel. Case v. Collins, 19 Wend. 56, 68.

Order directing the issue of peremptory writ of mandamus should be granted.