### Crain, et al. v. Walker, et al.

(Decided February 3, 1928.)

Appeal from Hardin Circuit Court.

1.  Schools and School Districts.—Inmates of Baptist Orphans' Home, maintained by corporation organized under Kentucky Stats., sec. 879, held to have become residents so as to require payment by state to school authorities of district in which it is located the per capita pro rata of state school fund, so as to entitle them to attend public schools maintained by such fund.

2. Domicile.—Residence of infant of tender years follows that of parents or one of them who has legal custody of him or of one who stands in relation of loco parentis to him.

3. Domicile.—Where volition enters into question of residence, it is general rule that intention followed by acts and conduct in conformity therewith will usually fix place of residence, but such fact seldom, if ever, enters into inquiry where residence of infant is involved.

4. Domicile.—Question of residence for school purposes should not be confused with domicile, since one may have legal domicile at one place and actually reside at another, with intention of returning to domicile when he ceases to reside at such other place.

5. Schools and School Districts.—In determining whether inmates of orphans' home were residents of school district, entitling them to attend schools there, question as to procedure in case number of inmates should become so great as to unnecessarily burden taxpayers of district will not be considered until such situation is presented.

6. Schools and School Districts.—Arrangement under which inmates of Baptist Orphans' Home were to attend schools of school district and payment was to be made by state to school authorities of per capita pro rata of state school fund, held not to violate Constitution, sec. 189, prohibiting appropriation to aid sectarian school, where such orphans' home had no voice in employment of teachers, and teachers were not required to be members of Baptist religious denomination or any other church, and no control was exercised over them by officers, superintendents, or managers of home.

7. Courts.—Legal principles previously announced by court are only valuable as precedents when similar states of fact are involved.

HAYNES CARTER and C. B. LARIMORE for appellants.

H. L. JAMES and L. A. FAUREST for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

There is a duly organized graded school district in Hardin county, known as the Glendale graded common school district, which, when this action was filed, was under the management of appellees and some of the defendants below, Harry Walker et al., as trustees, and within the confines of its boundary there is located and maintained by the Kentucky Baptist Children's Home, a charitable corporation organized under the provisions of section 879 of our present Statutes, a children's home, in which there have been gathered, exclusively from various points within the commonwealth, a number of children to be reared, provided for, and educated by the

charitable corporation, and at the time of the institution of this action there were in the home 221 of such inmates within the public school age. Practically all of them were qualified for entrance into only the primary grades of our public school system. The home was established in 1915, and began by acquiring the property theretofore owned and operated by an institution known as Lynnland College, and which has since been converted into the present home for orphan children, and the facilities for its maintenance have been considerably enlarged.

In 1919 its then manager, who was a man of considerable experience in the management of such institutions, and who is known in this record as "Daddy" Moore, entered into a verbal arrangement with the trustees of the school district whereby the latter agreed to furnish and pay the salaries of three teachers in the primary grades, and they taught the school for such grades in three rooms that the home agreed to, and did furnish and equip with heat, light, seats, and all other equipment for the teaching of such a school, the home being located some mile or more away from the site of the graded school building of the Glendale graded common school district; but it was a part of that agreement that any other child in the district who was entitled to receive instruction in such grades would be permitted to attend the schools being taught at the place and in the manner indicated. It was also agreed that the transportation of any pupils from the home who took any course of instruction furnished at the high school building would be transported by the home free of charge—in consideration for all of which the district was permitted to receive the state per capita for all of the students in the home, and an additional donation of $675, which for the scholastic year of 1926-27 was increased to $775. By this arrangement a small portion of trackage of the Louisville & Nashville Railroad Company was brought into the district for the purposes of taxation, as was also the same mileage of telegraph and telephone lines with the franchise assessments for such aliquot portions of the lines. The state per capita received by the district under that arrangement for the last scholastic year mentioned, plus the taxes referred to, aggregated a sum amounting in round numbers to $3,400.

This equity action was filed by appellants and plaintiffs below, F. L. Crain, and two other citizens and tax-

payers residing in the school district, against its trustees and the charitable corporation that maintained the home in which it was sought to perpetually enjoin defendants from carrying out the above arrangement upon the grounds: (1) That the inmates of the home were not entitled to attend the schools of the district, because they were not residents therein; (2) that the corporate defendant had no right to continue to bring into the district the orphaned inmates of the institution and to demand or require for them the privilege of attending the public schools of the district; and (3) that the arrangement was in direct violation of the provisions of section 189 of the Constitution, saying:

"No portion of any fund or tax now existing or that may hereafter be raised or levied, for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian or denominational school."

Appropriate pleadings made the issues, and, upon final submission, after evidence taken, the trial court dismissed the petition, and, complaining of it, plaintiffs prosecute this appeal. We will discuss and determine the three grounds in the order mentioned.

1. It is conceded that for the inmates of the home to be entitled to admission into the public schools within the district, they should be residents therein within the meaning of the statutes so prescribing. At the threshold it should be remembered that those whose residential status is involved are the orphaned inmates of the home, and who are the ones whose primary rights are to be affected by the solution of the question. There are a great number of relations in life wherein the question of one's residence is involved, and what might be held sufficient to solve it in one case might be insufficient in another. The question is also sometimes affected by the class to which the one affected belongs; as, for instance, an adult, or one who is, of sufficient age to choose his residence, may do so in a different manner than a mere infant, who, on account of his youth, is incapable of exercising volition in that respect. In the latter case the universal rule is that the residence of an infant of tender years follows that of his parents or the one who has the legal custody of him, or of one who stands in the relation of loco parentis to him.

In regard to the first part of the above statement,. one set of facts may constitute residence for the purpose of entry into public schools, while a different state of facts might be required to render one a resident so as to entitle him to exercise his right of suffrage, and yet another state of facts would be required for the purposes of levying taxes on personal property, and still another for the purpose of conferring jurisdiction for the probate of wills. Hence, where volition enters into the question, it is the general rule that intention, followed by acts and conduct in conformity therewith, will usually fix the place of one's residence; but such fact seldom, if at all, enters. into the inquiry where the residence of an infant is involved. Moreover, the question of residence in a case like the one before us should not be confused with domicile, for it is a well-known principle of law that one may have a legal domicile at one place, and actually reside at. another, with the intention of returning to his domicile when he ceases to *reside* at the other place. With these observations in mind, and keeping also in mind the purpose of the commonwealth in providing a free public school system so as that all children within its borders. should have extended to them the opportunity of a limited free education, let us inquire what is the law with reference to a sufficient compliance with the statute to entitle a pupil within the free school age to attend a public school?

The text in 24 R. C. L. 624, par. 83, under the heading of "What Constitutes School Residence," starts out. with the general statement that:

> "In determining whether a person is or is not a resident in a school district within the meaning of such a rule (the statutory one requiring it) the usual and ordinary indicia of residence or the absence thereof should be the proper guide."

That text is supported by a reference in the note to the case of Board of Trustees of Stanford Graded School District v. Powell, 145 Ky. 93, 140 S. W. 67, 36 L. R. A. (N. S.) 341, Ann. Cas. 1913B, 1016. The text then proceeds to say:

> "Residence entitling an infant to school privileges is distinguished from domicile, or the technical and narrow use of the term 'residence,' for the

purpose of suffrage or other like purposes, and it is construed in a liberal sense as meaning to live in, or be an inhabitant of, a school district, the purpose being not to debar from school privileges any child of school age found within the district under the care, custody, or control of a resident thereof. Such rule does not usually require that there be a legal domicile, but it is sufficient if the child and its parent, or the person in loco parentis, are actually resident in the district, with apparently no present purpose of removal."

Further on, the compiler refers to a few cases from other courts holding that residence for school purposes is equivalent to domicile, and is to be supported by the same facts and the same legal principles. But the Powell case repudiates that doctrine, and expressly holds that "for school purposes a child's residence is not necessarily that of its parent or parents," and that, if it has assumed a permanent home with some other person standing in loco parentis to it, then the residence of the child for school purposes is the same as that of such person. The opinion in the Powell case distinguished it from the prior one of Board of Education of Winchester v. Foster, 116 Ky. 484, 76 S. W. 354, 25 Ky. Law Rep. 723, 3 Ann. Cas. 692, relied on by counsel for plaintiffs, by pointing out that the parents of the child in that case lived in a home that they owned, and which was located in another state, and that the father did not relinquish control over the child, nor did its uncle, who resided in Winchester, and to whom its temporary custody was given, acquire any control over it, or assume any responsibility over his niece while she resided in his family. The Powell opinion also referred to the cases of Yale v. West Middle School District, 59 Conn. 489, 22 A. 295, 13 L. R. A. 161, and People ex rel. Brooklyn Children's Aid Soc. v. Hendrickson, 54 Misc. Rep. 337, 104 N. Y. S. 122, in each of which the parents of the child, though nonresidents of the state, delivered its custody to the resident of the school district, with the intention and purpose that it should permanently live and reside with that person who thereby occupied the place of parent to the child, and whose residence thereafter became that of the child, so as to entitle it to the benefit of the public schools.

It is shown by the record that no child is taken into the home unless both parents are dead, or one of them is dead, and the living one is in such indigent circumstances as to be unable to take care of and provide for it. In other words, the central purpose is the most laudable one of gathering up helpless waifs and rearing them with at least a modicum of the opportunities of life whereby they may become useful and valuable citizens, and their opportunities widened and enlarged. Without such services, their lives would be cramped in every way, and they, for the lack of opportunity, might become a menace, instead of an asset, to society. If the home should not undertake the task, then it would either devolve upon the county or state, or upon some charitably disposed individual; otherwise the child might sooner or later drift into ways and courses that lead to destruction. If, however, he should succeed in escaping the latter, he would still be deprived of the benefits of a good home, a moral atmosphere, and the foundation of an education.

Before any inmate is taken into the home, the one who has custody of it is required to relinquish in writing all control over the child, and confer it absolutely on the home; the latter agreeing to assume it, and to render the services enumerated, until the ward, if a female, is 18 years of age, or, if a male, 16 years of age, and to not then surrender its custody, unless the child becomes satisfactorily engaged or situated, and the watchfulness over it does not entirely cease until it arrives at the age of 21 years. Evidently the inmates are entitled to claim their residence as located at some place. They cannot be considered to be absolutely without one, and, if it is not located where the home is, and to which they have been relinquished in the manner indicated, then where, may we inquire, would their residence be? They are mostly, as we have stated, without parents, and possibly without relatives, and, in either event, they are without the means whereby the accommodations of such a home could be furnished. If it should be held, as is contended by plaintiffs, that their residence is at the place from whence they were taken, then it would be the duty of each school census enumerator to include them in the list for that particular district, and it would draw the per capita that the people throughout the state provided for the individual benefit of the orphans in the home, and they would lose all such benefits while living in and located at the home. They would thereby be deprived of the only

public fund that was provided solely for the purpose of educating them, and for no other reason than that of their misfortunes, which solely and alone created the necessity of providing a home for them. Surely it was never the intention of the Legislature for the statutes under which the free school system is maintained to receive any such interpretation.

It will, no doubt, be conceded by plaintiffs that, if some kindly and charitably disposed individual should adopt, or in any manner legally assume the duties and obligations of rearing a number of children, and furnishing them a home, and in every practical way assuming the position of parent towards them, such children, if otherwise entitled to attend the public schools, would become residents at the home of their benefactor so as to enable them to attend the local public schools, although he himself might be a pauper, and with no means of carrying his good intentions into execution, except a commendable determination and a sound body and mind. The imagined case is actually met with in life, and we can conceive of no reason for distinguishing it from a charitable corporation imbued with like purposes and prompted by like considerations.

But it is argued that the cases of Lake Farm v. School District, 179 Mich. 171, 146 N. W. 115, 51 L. R. A. (N. S.) 234; Parris v. Brooksville School District, 164 Pa. 607, 30 A. 509, 26 L. R. A. 584; and Fry v. Upper Swatara Township School District, 164 Pa. 603, 30 A. 507, 26 L. R. A. 581, are to the contrary, and hold that the inmates of the charitable institutions involved in them were not entitled to attend the local public schools upon the ground that they did not fulfill the statutory requirements of those jurisdictions with reference to residence in the district. In the Michigan case the home of the charitable corporation was not in the district, but it had a farm that was located in the district wherein the public school was maintained. Other differentiating facts could be pointed out; but, if we should concede that the facts therein substantially coincide with those here, and that the applicable statutes were substantially the same, then we are unwilling to adopt the reasoning or the conclusion of the court when it denied the admittance of the inmates of the home into the school, and which was arrived at because they were not residents of the district.

In one of the Pennsylvania cases, supra, the charitable institution that maintained the home was supported entirely by public funds donated out of the public

treasury, and in the other one it was in a great measure so supported, and the court emphasized that fact, and largely rested its opinions upon it, and in doing so it reasoned that it was the intention of those making the appropriations for them to be the exclusive ones for such unfortunates, and not to allow them the additional educational privilege of also attending the free public schools. A late case dealing with the question is that of Independent Order of Odd Fellows of West Virginia v. Education Board, etc., of Elkins, 90 W. Va. 8, 110 S. E. 440, 48 A. L. R. 1092, in which the court concluded that the inmates were entitled to the benefit of the public schools established and maintained in the district where the home was located. It is true that the court in that opinion referred to the fact that the maintainer of the home only undertook to "care for and support" the orphans who were its inmates, and did not undertake to *educate* them, since there was no prevailing statute under which it might be incorporated for the latter purpose. We have such a statute here, and under which the Baptist Orphans' Home was incorporated, but on that particular point we fail to appreciate the reasoning of the West Virginia court, since our conclusion is that, when the charitable corporation created under our statute comes into existence, it thereby qualifies itself to act in the position of parent toward its wards, and is obligated to do everything for them that the parent would be required to do, including all duties in respect to education, and that all of the statutory laws of the commonwealth defining and prescribing such duties are applicable to, and should be observed by it, an instance of which is our compulsory educational statute.

Great stress is made in briefs on the fact that the property of the home in this case is exempt from taxation, but the same was true in all of the cases referred to, and is almost universally the fact. Because thereof, it is argued that great hardship will be entailed on the taxpayers of the Glendale graded school district (but which the proven facts in this case demonstrate is untrue), and the West Virginia court, where it was also made, thus answered it:

"This may be so; but if so, relief must be obtained from the Legislature and not from the courts. The courts do not make our school law, nor do they determine the objects of taxation for school purposes."

Other cases sustaining the view herein expressed will be found in the annotation appended to the West Virginia case as reported in 48 A. L. R. beginning on page 1092; and the domestic one of Weller v. Muenninghoff, 155 Ky. 77, 159 S. W. 632, held that the inmates of a county almshouse, after the required time of occupancy, became residents of the voting precinct in which the institution was located so as to entitle them to vote therein, which according to the excerpt, supra, from 24 R. C. L. 624, requires a more technical and narrow use of the term "residence" than is required to establish it for the purpose of attending and reaping the benefit of public schools. The inmates of such an institution are not as permanently located therein as are the inmates of the Baptist Orphans' Home in this case, and under the facts presented, viewed in the light of the adjudged legal principles, supra, we unhesitatingly conclude that the children of the Baptist Orphans' Home, upon entry therein, became residents there so as to require the payment by the state to the school authorities of the district in which it is located the per capita pro rata of the state school fund, and so as to entitle them to attend the public schools maintained by such fund.

2. What we have said in disposing of ground 1, in a large measure disposes of ground 2. Grave apprehension is manifested in briefs for plaintiffs that in the course of time there will be gathered in the school district by the Baptist Orphans' Home such a great number of inmates as to greatly and unnecessarily burden the taxpayers of the district, and to disastrously operate upon the maintenance of its schools; but that apprehension is rendered less alarming by the payment to the district of each pupil's pro rata of the state public school funds, as is demonstrated by the proven facts in this case. The expenses of the district in carrying out the arrangement sought to be enjoined is shown to be in the neighborhood of $1,900, when the increased income to the district thereby, as we have seen, is about $3,400, thereby creating a surplus to be expended by the school trustees for the benefit of the schools. It would, perhaps, not be proper, however, to give that fact legal weight in arriving at our conclusion, but it does demonstrate that plaintiffs and those whom they represent are not detrimentally affected by the arrangement. Whatever may be the eventual result of such apprehension, if it should

finally occur, it would present a situation to be then dealt with, and which, no doubt, would be solved so as to do justice to all concerned. It is sufficient for our present purposes to say that no such situation is presented.

3. In support of this ground, chief reliance is had upon the domestic case of Williams v. Board of Trustees of Stanton Graded School District, 173 Ky. 708, 191 S. W. 507, L. R. A. 1917D, 453. In that case a denominational school, operated under the auspices of the Presbyterian church, was located within the school district. The school "was organized for the purpose of teaching and spreading the ecclesiastical polity of the Presbyterian church," and the church employed the teachers in the school. The curriculum included not only the common school branches and others necessary for the acquisition of a liberal education, but also "religious tenets and the dogmas of the Presbyterian church." The trustees of the graded school district entered into a contract with the authorities of the Presbyterian school whereby the latter leased to the former the grounds and school buildings of the denominational school for the purpose of conducting therein the graded school for the district. The trustees of the public school employed two of the former teachers employed in the church school, while the church board employed the four other teachers therein, and practically the management of the district school was turned over exclusively to the church authorities, and the money arising from taxation for the purpose of maintaining the district school was thereby unlawfully diverted by being practically turned over to the church authorities maintaining the denominational school. That arrangement was sought to be enjoined as violative of the provisions of section 189 supra, of our Constitution. This court so held in its opinion in that case and in which it is stated, inter alia:

> "The evidence further conduces to show that the teachers and pupils of the graded school conducted in the college building are really as much under the control of Mr. Hanley (the head of the denominational school) as the teachers and pupils of Stanton College; that the graded common school trustees have virtually surrendered to Mr. Hanley all control over the conduct and management of the graded school; that the two graded school teachers, although nominally contracted with by the graded

school trustees and paid out of the common school fund, were really selected by Mr. Hanley. . . . And if the arrangement between Stanton College and the graded school should be subjected to the scrutiny of this not too comprehensive or rigid test, the evidence makes it plain that it was of such a nature as to reasonably create the belief that the graded school trustees had abdicated all control and authority over the graded school and delivered its conduct entirely to Mr. Hanley, the head of the sectarian institution.''

If the facts herein measured up to those contained in the excerpt from that opinion, the only course would be to sustain this ground, and grant the relief prayed for in the petition. But we have no such facts in this case, nor any approaching thereto. The Baptist Orphans' Home has no voice in the employment of any of the teachers of the graded school district, nor are any of them required to be members of the Baptist religious denomination or any other church. No control of any character is exercised over them by the officers, superintendents, or managers of the home. As a matter of fact, only one of the three teachers of the primary grades taught in the rooms furnished by the home is a member of the Baptist Church, the other two being members of the Christian Church. No requirement is made that any inmate of the home shall receive sectarian instruction or be taught any creed of any religious denomination; nor are the inmates required to be children of Baptist parentage—all of which widens the gulf separating the facts of the Williams case from those in this one.

Because of such difference of facts, the conclusions therein reached find no application here, since prior announced legal principles are only valuable as precedents when similar states of fact are involved. It was never intended by the section of the Constitution, supra, to withhold the right to teach public schools in buildings rented, or their use otherwise acquired, from others, if the circumstances justified it, although the building may be owned by a particular religious denomination. The vice sought to be prevented by the constitutional provision was the teaching of religious sectarianism in schools maintained by public funds, and which it is in-

disputably shown was not true in this case, but which was true in the relied on Williams case. We therefore conclude that this ground is also without merit.

Wherefore the judgment is affirmed.

The whole court sitting.