RENDERED:  SEPTEMBER 18, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-001430-MR

BRACKEN COUNTY BOARD OF EDUCATION                    APPELLANT


APPEAL FROM FRANKLIN CIRCUIT COURT
v.           HONORABLE THOMAS D. WINGATE, JUDGE
ACTION NO. 18-CI-00843


AUGUSTA INDEPENDENT BOARD OF EDUCATION; and
KENTUCKY BOARD OF EDUCATION/KENTUCKY
DEPARTMENT OF EDUCATION                              APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  KRAMER, LAMBERT, AND TAYLOR, JUDGES.

KRAMER, JUDGE:  The Bracken County Board of Education (Bracken) appeals

an order of the Franklin Circuit Court, in which the circuit court vacated, on

subject matter jurisdiction grounds, the Kentucky Department of Education's

("KDE's") administrative disposition of litigation Bracken had instituted against appellee Augusta Independent Board of Education. Finding no error, we affirm.

In general, a common school district in Kentucky with a higher population of pupils who are its legal residents is entitled to a greater distribution from the Fund to Support Education Excellence in Kentucky ("SEEK"). *See generally* Kentucky Revised Statutes (KRS) 157.360. With that in mind, this case stems from an ongoing dispute between two neighboring school districts (*i.e.*, Bracken and Augusta) over whether and under what circumstances a student should be considered the "legal resident" of a school district, and accordingly enrolled in that school district, if he or she is purportedly residing with an informal caregiver rather than a legal custodian.

The crux of this dispute involves Bracken's accusation that Augusta (a city school district located in the county of Bracken) improperly enrolled approximately sixty of Bracken's legal residents, and therefore received SEEK funds per each pupil which Bracken would have otherwise received. Bracken alleges Augusta perpetrated this alleged impropriety in large part by encouraging a number of Bracken families to: (1) appoint legal residents of Augusta as their children's "educational powers of attorney" (POAs); (2) ostensibly represent that their children "reside" with the POA; and (3) based upon that representation, to claim the POA's Augusta residence as a pretext for securing their children's

enrollment in Augusta's schools, rather than Bracken's schools – thereby allowing the parents to enroll their children in Augusta schools on a tuition-free basis, and allowing Augusta to claim their children, for purposes of SEEK funding, as its legal residents.

With that said, Bracken sought to resolve this dispute by initiating proceedings before the Kentucky Department of Education (KDE), asserting that KDE, by and through its Commissioner of Education ("Commissioner") and the Kentucky Board of Education ("Board"), had subject matter jurisdiction to resolve the issue at the heart of its claims against Augusta – namely, whether the approximately sixty pupils qualified as legal residents of Bracken or Augusta. However, none of the families or children at issue was named as a party in the underlying action.

Over Augusta's protests, the Commissioner determined that by virtue of KRS 157.350, the KDE (by and through its Commissioner and Board) had the requisite subject matter jurisdiction to resolve whether the approximately sixty pupils qualified as legal residents of Bracken or Augusta. The Commissioner proceeded to determine that a majority of the approximately sixty students Bracken had identified in its suit were indeed the legal residents of Bracken, rather than Augusta. Based upon that essential determination, the Commissioner then made several other determinations. Specifically, the Commissioner: (1) concluded that

"Augusta acted in bad-faith and attempted to subvert the nonresident student agreements[1] when it instructed parents of students who resided in the Bracken district that POAs were an alternative to paying tuition to attend Augusta"; (2) directed Augusta regarding the type of evidence Augusta must collect from students utilizing POAs if it wished to continue claiming them as its legal residents for enrollment purposes; and, the Commissioner further directed:

> 3. Concerning all students enrolled in Augusta pursuant to a POA in 2018-2019 and 2019-2020 school years, which could potentially include students addressed in this Appeal, Augusta shall provide KDE copies of said POAs by September 1st of each year or within 15 days of receipt if after September 1st and a statement executed by the DPP and Superintendent addressing each student and setting forth an explanation for why enrollment in Augusta is warranted and how the decision was ascertained and supported. The primary fact to be considered is where a student lies his or her head most nights, but additional supporting information must be provided to KDE to show how same was established.

> 4. Augusta will be subject to an attendance review conducted by KDE at the conclusion of the 2018-19 school year to verify the accuracy of its attendance records. This review will be conducted using the scope and procedures outlined on the "Attendance Review Program Form" that is available for review on KDE's website. The procedures, however, will be expanded to provide further testing for nonresident students covered

---

[1] The "nonresident student agreements" referenced by the Commissioner are a facet of KRS 157.350(4), and are discussed in-depth below. As with his other determinations, the Commissioner's conclusion that Augusta "acted in bad-faith and attempted to subvert the nonresident student agreements" – essentially a determination that Augusta was in breach of contract – depended upon the Commissioner's "legal residence" determinations.

-4-

by POAs. If Augusta is found to be in compliance with the regulations regarding nonresident students, and the terms of this agreement, then Augusta will be placed back in the normal rotation cycle for future attendance reviews.

Augusta filed an administrative appeal with the Board. The Board affirmed the Commissioner's determination of subject matter jurisdiction, along with the remainder of the Commissioner's order that had depended upon his residency determinations.

Thereafter, Augusta sought relief in Franklin Circuit Court. In disposing of this matter, the circuit court expressed dismay over the Commissioner's and Board's assumptions that they were authorized to determine the legal residences of approximately sixty individuals – none of whom had ever been parties to the proceedings. Notwithstanding, the circuit court vacated after determining that KDE (by and through its Commissioner and the Board) had lacked subject matter jurisdiction to resolve this dispute.

This appeal followed.

As indicated, the question presented in this appeal is whether KDE has subject matter jurisdiction to adjudicate whether a pupil qualifies as a legal resident of a given school district. The statute which Bracken, the Commissioner, and the Board relied upon to answer that question in the affirmative, KRS 157.350, provides in relevant part as follows:

Each district which meets the following requirements shall be eligible to share in the distribution of funds from the fund to support education excellence in Kentucky:

(1) Employs and compensates all teachers for not less than one hundred eighty-five (185) days. The Kentucky Board of Education, upon recommendation of the commissioner of education, shall prescribe procedures by which this requirement may be reduced during any year for any district which employs teachers for less than one hundred and eighty-five (185) days, in which case the eligibility of a district for participation in the public school fund shall be in proportion to the length of time teachers actually are employed;

(2) Operates all schools for a minimum school term as provided in KRS 158.070 and administrative regulations of the Kentucky Board of Education. If the school term is less than one hundred eighty-five (185) days, including not less than one hundred seventy (170) student attendance days as defined in KRS 158.070 or one thousand sixty-two (1,062) hours of instructional time, for any reason not approved by the Kentucky Board of Education on recommendation of the commissioner, the eligibility of a district for participation in the public school fund shall be in proportion to the length of term the schools actually operate;

(3) Compensates all teachers on the basis of a single salary schedule and in conformity with the provisions of KRS 157.310 to 157.440;

(4) *Includes no nonresident pupils* in its average daily attendance, except:

>(a) 1.  Pupils listed under a *written agreement*, which may be for multiple years, with *the district of the pupils' legal residence*.
>
>2.  *If an agreement cannot be reached, either board may appeal to the commissioner for settlement of the dispute*.
>
>3.  The commissioner shall have thirty (30) days to *resolve the dispute*.  Either board may appeal the commissioner's decision to the Kentucky Board of Education.
>
>4.  The commissioner and the Kentucky Board of Education shall consider the factors affecting the districts, including but not limited to academic performance and the impact on programs, school facilities, transportation, and staffing of the districts.
>
>5.  The Kentucky Board of Education shall have sixty (60) days to approve or amend the decision of the commissioner; and

(b) A nonresident pupil who attends a district in which a parent of the pupil is employed.  All tuition fees required of a

nonresident pupil may be waived for a pupil
who meets the requirements of this
paragraph.

This subsection does not apply to those
pupils enrolled in an approved class
conducted in a hospital and pupils who have
been expelled for behavioral reasons who
shall be counted in average daily attendance
under KRS 157.320[.]

(Emphasis added.)

As to why Bracken believed KDE had subject matter jurisdiction in this context – a belief that KDE's Commissioner and Board adopted – Bracken began by noting that under subsection (4) of this statute, SEEK funds could not properly be distributed to a school district if the school district's "average daily attendance" included "nonresident pupils," unless the "nonresident pupils" in question were, pursuant to section (4)(a)1., "listed under a written agreement, which may be for multiple years, with the district of the pupils' legal residence." Further, Bracken observed that section (4)(a)2. provided, "If an agreement cannot be reached, either board may appeal to the commissioner for settlement of the dispute."

From these provisions, Bracken surmised that any "agreement" contemplated in subsection (4)(a)1. would necessarily include an agreement between the two school districts regarding *who* their respective legal residents *were* – otherwise, how could they effectuate an agreement regarding their *non*residents?

-8-

And, while Bracken conceded it *had* entered into written nonresident agreements with Augusta as contemplated by subsection (4)(a)1., it asserted that there had been no meeting-of-the-minds regarding *who* their respective legal residents *were*: Because Augusta had simply concluded on its own volition that the pupils who had utilized the POAs qualified as its residents, it had not "listed" them in any nonresident agreement with Bracken and had instead secured SEEK distributions based upon "average daily attendance" reports that had factored the attendance of those pupils – as Augusta's legal residents – into their averages.

Bracken reasoned, therefore, that because no "agreement" existed between itself and Augusta regarding the legal residences of the POA pupils, the Commissioner was accordingly empowered, pursuant to subsection (4)(a)3., to "resolve" whether the POA pupils were legal residents of Bracken or legal residents of Augusta, and that subsection (4)(a)3. likewise empowered the Kentucky Department of Education to review the Commissioner's determination in that respect.

To be sure, an administrative agency such as the KDE, through its Commissioner and Board, is empowered and required to determine its own subject matter jurisdiction before proceeding in any given matter. *See Liquor World of Corbin, LLC v. Commonwealth Dep't of Alcoholic Beverage Control*, 458 S.W.3d 814, 816 (Ky. App. 2014). However, any such agency determination is subject to

*de novo* review from the courts, and it is further qualified by "Kentucky's strong stance against vague delegations" of power referred to as the "nondelegation doctrine." *Board of Trustees of Judicial Form Retirement System v. Attorney General of the Commonwealth of Kentucky*, 132 S.W.3d 770, 781-82, 784 (Ky. 2003) (describing at length the "nondelegation doctrine" in Kentucky). This doctrine compels us to strictly limit an agency's authority to that clearly delegated and no more.

In other words, our common law has long adhered to the doctrine that the powers of administrative agencies "are limited to those conferred expressly by statute or which exist by necessary and fair implication. . . . But these implications are never extended beyond fair and reasonable inferences." *Blue Boar Cafeteria Co. v. Hackett*, 312 Ky. 288, 227 S.W.2d 199, 201 (Ky. 1950). "Powers not conferred are just as plainly prohibited as though expressly forbidden[.]" *Louisville and Jefferson County Planning Commission v. Schmidt*, 83 S.W.3d 449, 460 n.14 (Ky. 2001) (quoting *Allen v. Hollingsworth*, 246 Ky. 812, 56 S.W.2d 530, 532 (1933)) (Keller, Justice, concurring).

With that in mind, Bracken – like the Commissioner and Board below – concedes that nothing in KRS 157.350 or any other statute expressly confers to KDE subject matter jurisdiction to determine the legal residence of any individual. But, Bracken insists the "dispute" that the Commissioner is empowered to

"settle[]" or "resolve" pursuant to KRS 157.350(4)(a)2. and (4)(a)3. necessitated or fairly implied that authority.

We disagree. In *Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011), the basic principles of statutory construction were summarized as follows:

> In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. . . . We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes. . . . We also presume that the General Assembly did not intend an absurd statute or an unconstitutional one. . . . Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts. . . .

(Citations omitted.)

Here, the "dispute" identified in KRS 157.350(4)(a)2. and (4)(a)3. contemplates a dispute that two opposing school districts could have *exclusively* resolved on their own and in a binding manner by entering into an "agreement" (*e.g.*, a contract) with one another; pursuant to section (4)(a)2., the Commissioner only becomes involved if they do *not* reach an agreement. And for at least two reasons, it would lead to absurdity if we were to presume that the General

-11-

Assembly, in drafting this provision, intended two opposing school districts to "agree" on a third party's legal residence. First, the "agreement" would never be binding upon any third party. *See Harlan Public Service Co. v. Eastern Const. Co.*, 254 Ky. 135, 71 S.W.2d 24, 29 (1934) (explaining that to constitute a binding contract, minds of the parties must meet, and one cannot be bound to a contract to which he was not a party, nor by uncommunicated terms without his consent).

Second, courts are not bound by agreements between contracting parties as to the interpretation of the law. *See Swift & Co. v. Hocking Valley R. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 289, 61 L.Ed. 722 (1917). And, as the phrase implies, an individual's "legal residence" is a *legal* determination – that is, a mixed question of law and fact determined by *courts*, not school districts. *See, e.g., Beechwood Board of Education v. Wintersheimer*, 493 S.W.3d 390 (Ky. 2016) (adjudicating liability for school tuition based upon legal residency);[2] *see also*

---

[2] In his order, the Commissioner asserted that KRS 158.120(1) illustrated that the Board at least had statutory authority to determine the legal residences of students. In relevant part, it provides:

> Any board of education may charge a reasonable tuition fee per month for each child attending its schools whose parent, guardian, or other legal custodian is not a bona fide resident of the district. Any controversy as to the fee shall be submitted to the Kentucky Board of Education for final settlement.

However, the Commissioner was incorrect on this point, too. While KRS 158.120(1) relates to tuition fees charged to an individual who is not a "bona fide resident of the district," it explicitly states that the Board is authorized to resolve "[a]ny controversy as to the fee." *Wintersheimer*, 493 S.W.3d 390, illustrates that controversies over the residency status of the individual charged the fee are reserved for the courts.

-12-

*Wirth v. Board of Educ. for Jefferson County*, 262 Ky. 291, 90 S.W.2d 62, 64 (1935), explaining:

> The residence of Wirth while in the home of Heady is a mixed question of law and fact. We are convinced from a review of the evidence adduced, without giving weight to the chancellor's finding of facts, that the residence of Wirth, so long as he continues to remain in the home of Heady, is definitely fixed and governed by the principles stated in *Board of Trustees of Stanford Graded Common School District v. Powell*, 145 Ky. 93, 140 S.W. 67, 36 L.R.A. (N.S.) 341, Ann. Cas. 1913B, 1016, and *Crain v. Walker*, 222 Ky. 828, 2 S.W.(2d) 654. They are conclusive in the present one. And, accordingly, for common school purposes so long as he remains at Heady's home, Wirth is a resident of the common school district in which Heady resides, and he is entitled to attend, free of tuition, the common schools taught therein.

That aside, KRS 157.350(4)(a)4. removes any doubt that the "dispute" contemplated in KRS 157.350(4)(a)2. and (4)(a)3. was never intended to encompass a determination of an individual's legal residence. To review, it provides that in resolving the "dispute," "The commissioner and the Kentucky Board of Education shall *consider the factors affecting the districts*, including but not limited to academic performance and the impact on programs, school facilities, transportation, and staffing of the districts." (Emphasis added.)

As a general rule of statutory construction, the enumeration of a particular thing or class demonstrates that the omission of another thing or class is an intentional exclusion. *See Palmer v. Commonwealth*, 3 S.W.3d 763, 764 (Ky.

-13-

App. 1999). Here, the "factors" the General Assembly directed the Commissioner and Board to consider in resolving the "dispute" are not factors bearing upon determining the location of an individual's legal residence; they are "factors affecting the districts." In other words, the "dispute" in question relates to policy matters involving whether, and to what extent, two school districts can and should arrange with one another to accept nonresident students.

In short, the fact that KRS 157.350(4) *mentions* "legal residence" is not an invitation for two school districts, with or without the assistance of KDE, to legally *determine* a particular individual's (or *sixty* individuals') legal residence. At most, the statute's use of the term is merely an acknowledgement that a legal fiction must serve as the foundation of any nonresident agreement: While school districts have no authority to *adjudicate* an individual's legal residency, they are presumptively aware of who their legal residents are by virtue of their continuing statutory duties to diligently investigate who their legal residents are and to maintain a school census to that effect.[3] Moreover, we note that if a student under

---

[3] Children of school age are required to attend school, and the compulsory attendance laws in each school district are to be enforced by a director of pupil personnel (DPP) under the direction of the local board of education and its superintendent. *See* KRS 159.010(1)(a); *see also* KRS 159.130 (providing the director of pupil personnel "may investigate in their district any case of nonattendance at school of any child of compulsory school age or suspected of being of that age"). To that end, DPPs, working under the direction of superintendents, are obligated to "institute and maintain a complete, accurate, permanent, and continuous census of all children between the ages of five (5) and twenty-one (21) enrolled in the public schools in the district." KRS 159.250.

an informal custodianship arrangement were to seek enrollment in a school district in which his or her legal guardians do not reside, those statutory duties are certainly broad enough to obligate the two school districts to reasonably communicate that fact with one another (for the sake of tuition liability and SEEK funding), and if necessary, to seek judicial declaratory relief in that regard which, at minimum, would involve both school districts and the student's legal representative.

In light of the foregoing, we AFFIRM.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Suzanne Cassidy
Covington, Kentucky

BRIEF FOR APPELLEE AUGUSTA INDEPENDENT BOARD OF EDUCATION:

Stephen D. Wolnitzek
Covington, Kentucky