STATE EX REL. CONWAY and others, Appellants, vs. DISTRICT BOARD OF JOINT SCHOOL DISTRICT No. 6 OF THE TOWNS OF PLYMOUTH AND WONEWOC AND THE CITY OF ELROY, Respondents.

*February 3—February 22, 1916.*

Mandamus: *When writ issues: Mistake in remedy: Amendment of pleading: Constitutional law: Schools: Holding graduating exercises in church: Sectarian instruction: Nonsectarian prayers: Compelling support of or attendance at "place of worship:" "Rights of conscience:" Giving preference to modes of worship, etc.*

1. The writ of *mandamus* is not granted to take effect prospectively, and hence is not the proper remedy to compel a school board to hold future graduating exercises elsewhere than in a church and to omit from such exercises the offering of any invocation or prayer.

2. Under sec. 2836b, Stats. 1915, this court has power to permit plaintiffs who have mistaken their remedy and brought a wrong action to amend their pleading so that the matter in controversy may be disposed of on its merits.

3. Although graduating exercises are a part of a school curriculum and under the direction and control of the school board, the holding of such exercises in a church building is not in itself the giving of sectarian instruction, within the meaning of sec. 3, art. X, Const.

4. Where no charge is made for the use of the church in which such exercises are held and nothing is paid to the clergyman delivering an invocation, no one is compelled to "erect or support any place of worship, or to maintain any ministry, against his consent," nor is any money "drawn from the treasury for the benefit of religious societies," in violation of sec. 18, art. I, Const.

5. Parents and pupils of all denominations have the right to attend the graduating exercises of a public school without their legal rights being invaded; but in attending such exercises once a year in a church of a denomination other than that to which they belong they are not being "compelled to attend . . . any place of worship," within the meaning of sec. 18, art. I, Const. That section means that no one shall be required to attend a place where religious services are being held or religious instruction given at the time he is required to be present.

6. The holding of such exercises in a church does not constitute an "interference with the rights of conscience," within the meaning of sec. 18, art. I, Const.; nor is it a violation of any other provision of that section.

7. The final decision upon the question whether any right guaranteed by the constitution is violated must rest with the courts and not with the individual; and the mere assertion of persons who desire to attend graduating exercises with their children that being compelled to enter a church of a denomination other than their own is violative of their assured rights of conscience, does not make it so.

8. The offering of a nonsectarian invocation or prayer by a Catholic or Protestant clergyman at the annual graduating exercises of a public school is not sectarian instruction within the meaning of sec. 3, art. X, Const.; it does not interfere with any right of conscience which the law recognizes; permitting it is not the giving of any preference to any religious establishment or mode of worship, in a constitutional sense; nor does it violate any other provision of sec. 18, art. I, Const.

APPEAL from a judgment of the circuit court for Juneau county: JAMES O'NEILL, Circuit Judge. Affirmed.

The plaintiff filed a petition in the circuit court praying that a writ of mandamus issue from said court to the defendants commanding that they discontinue the practice of holding graduating exercises in any of the churches of the city of Elroy or churches elsewhere or permitting or suffering any minister or person to offer an invocation or prayer at the graduating exercises of such school district, and commanding the defendants to hold the graduating exercises in other places than in any of the churches of the city of Elroy or churches elsewhere, and for such further order or relief as might be proper. The petition set forth that the petitioners were residents and taxpayers of joint school district number 6 in the towns of Plymouth, Wonewoc, and the city of Elroy, in Juneau county, Wisconsin; that they were taxed for the support of said school and were entitled to the benefits thereof by having their children instructed therein according to law; that they are parents of children whom they

desire to have educated in said school, and that children of
the petitioners are in fact attending the same for the purpose
of receiving instruction.

The petition then recites that for many years it has been
the practice of the defendant board to hold graduating exer-
cises for high school graduates and that the practice still
prevails and is part of the school requirements of the district
board before pupils are granted diplomas; that it has been
the practice of the board to conduct a part of the graduating
exercises in the different churches of the city of Elroy and a
part of such exercises in the opera house and to invite and
engage certain ministers and priests to officiate at such grad-
uating exercises, their duty while so officiating being to give
a so-called invocation which consisted of a religious service,
prayer, blessing, or religious exercise; that by reason of the
practice followed by said board in engaging Protestant min-
isters and inviting Catholic priests to officiate at said grad-
uating exercises, it has wounded the sensibilities of both
Protestant and Catholic patrons of said schools alike and sub-
jected those patrons and others similarly situated to humilia-
tion and forced upon them "the offense of conscience" by rea-
son of these religious exercises, and that by reason of such
acts said board has allowed and encouraged sectarian instruc-
tion in the public school in question.

The petition further recites that since the establishment of
the district the practice complained of has been pursued
against the ineffectual protests of taxpayers, parents, and
patrons of the school and that the board threatens to continue
such practice; that by reason of the practice followed certain
citizens and taxpayers of Elroy belonging to the Catholic
church and living in the school district refuse to allow their
children who are about to graduate, as well as other children
of theirs, to attend the graduating exercises, and also refuse
to attend themselves on account of the religious functions
that are made a part of such exercises; that although such

practice has been followed for more than six years the school board has taken no steps to correct the abuse and such practice still continues and threatens to continue in the future; that by reason of the school board refusing to omit the practice set forth and by reason of the believers in the Catholic faith refusing to allow their children to attend graduating exercises, such children did not receive their diplomas at such exercises, but were granted them privately afterward by special request; that such a situation produces a bad state of affairs, both to the parents, patrons, and graduates of the school, and causes young men and women who desire to participate in the honors of graduation much chagrin and mortification at not being able to participate in the exercises with their fellow graduates; that because of conscientious scruples Catholic parents and citizens have refrained from taking part in what they believe to be distinctly Protestant religious worship, and that the practice of having prayers offered by Protestant ministers is contrary to the right of conscience and in violation of law; that petitioners have requested said board to discontinue the practice complained of to the extent of not holding the graduating exercises in churches and in not permitting prayers to be offered by denominational clergymen, and that said board has neglected and refused to comply with such request and refused to interfere with the matter in any way; that such graduating exercises are an integral part of the curriculum of our public schools; that permitting religious service to take place in a public school, and permitting a minister to offer an invocation or prayer at such time, amounts to a sanction of the minister of one sect and an invitation to lend his personal influence and prestige to the particular sect in preference to all others, and that this action amounts to the teaching of certain religious doctrines of the particular sect so favored.

The petition further shows that permitting ministers of different denominations to offer prayers to the graduates and

patrons assembled, irrespective of their religious creeds and regardless of the wording of the prayer, amounts to giving sectarian instruction; that such prayers must necessarily be clothed with external form for delivery and reception and held with internal significance; that it is these various forms, together with their various significances, which constitute the various sectarian churches, and that prayer in the Protestant service is delivered standing and received sitting, and in the Catholic service it is offered and received kneeling; that Protestants worship a Supreme Being by prayer alone and hold that prayer is supreme worship; that Catholics worship the Supreme Being by official sacrifice and prayer and teach that official sacrifice is supreme worship; that prayer, therefore, as well in external form as doctrine, differs with the different services and is sectarian, and is therefore in violation of sec. 3 of art. X of the constitution; that by permitting the acts complained of in a public school the board has permitted and suffered the practice of religious and sectarian instruction to become part of the public school curriculum which is conducted by those who are allied by profession to sectarianism and who teach the same by suggestion; that such practice interferes with religious liberty and subjects the pupils to slight, insult, and contempt because of their religious faith.

The petition then recites that the petitioners enjoined the school board in the year 1912 from carrying on any religious services in connection with the graduating exercises and that thereupon said board refused to hold any graduating exercises at all; that such action tends to engender strife and to perpetuate in a public school curriculum religious and sectarian doctrines and to impress upon the pupils that they can expect no honors or favors at the hands of the school board unless it is permitted to hold graduating exercises in accordance with certain religious and sectarian forms.

Upon this petition an alternative writ of *mandamus* was

issued.    The defendants made a motion to quash such writ because neither the petition nor the writ stated facts showing that the petitioners or either of them were entitled to such writ.    The issue joined by the motion to quash was heard before the court and such motion was granted.    From a judgment entered in accordance with the decision of the court the plaintiffs appeal.

*James P. Riley,* for the appellants.

For the respondents there was a brief by *Grotophorst, Evans & Thomas,* and oral argument by *Evan A. Evans.*

BARNES, J.   It is fortunate that the present hapless controversy is of a genus that seldom makes its appearance in this court.   Our population is made up of many people divided into many religious sects, as well as many people who belong to no sect, all of whom contribute to the maintenance of our state school system in proportion to their ability to pay.   The number of our people who do not believe in the existence of a Supreme Being and in Life Hereafter is almost negligible.   Of the vast majority who do, some think Eternal Bliss can be most safely insured by pursuing one route and others by pursuing other routes, and hence the number of sects into which we are divided.   There is no subject on which people are more touchy than on that of religion. We may think that there is small reason for such a state of mind, but it is a "condition and not a theory" which confronts us.   It may well be said that the grievance here complained of is trifling, but human nature is much the same whether the individual be Catholic or Protestant.   Reverse conditions and let a Catholic school board select a church or building devoted to Catholic services in which to hold graduating exercises and engage a Catholic clergyman to deliver a nonsectarian prayer or invocation, and the devout Lutheran, Presbyterian, Methodist, Baptist, or other member of a Protestant communion would be just as likely to take

umbrage at what was done as were the petitioners in the present case. Our constitution makers wisely sought to prevent as far as they could the injection into the affairs of state of anything that would tend to germinate or foster religious rancor or bitterness. It is wise and just that its provisions be adhered to in spirit as well as in letter. For reasons that will be stated later, we conclude that the petitioners are not entitled to relief on the facts stated. Nevertheless, we think it would be a wise exercise of official discretion to discontinue such practices as are here complained of when objection thereto is made by any substantial number of school patrons. We do not underrate the efficacy of prayer. Neither are we prepared to say that the average high school graduate may not need it. But whenever it is likely to do more harm than good, it might well be dispensed with. It is not at all times wise or politic to do certain things although no legal rights would be invaded by doing them.

Turning aside from ethical considerations and taking up the legal questions involved, it is clear that if the plaintiffs have a cause of action they did not pursue the proper remedy. It was here sought to use the writ of *mandamus* to compel the school board to do away with the practices complained of at the graduation exercises to be held for that year. The writ is not granted to take effect prospectively. 2 Spelling, Injunctions, § 1385; High, Extr. Leg. Rem. (3d ed.) §§ 12, 36; Tapping, Mandamus, 10 ('74 Law Lib. 63); Wood, Mandamus (2d ed.) 51. In *State ex rel. Board of Ed. v. Hunter,* 111 Wis. 582, 588, 87 N. W. 485, this court said:

"The general principle is frequently stated that *mandamus* will not lie to compel performance of an act by a public officer unless the act be one that is actually due from the officer at the time of the application. Until the time arrives when the duty should be performed, there is no default of duty; and mere threats not to perform the duty will not take the place of default."

This rule was again announced in *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964. It is in accordance with the well nigh uniform current of authority and may well be said to be elementary.

Counsel on both sides expressed the desire that the court should take up the case on the merits and dispose of it if possible. The request is a commendable one. If the plaintiffs have a cause of action but have mistaken their remedy, it is a better administration of justice to permit them to amend their pleading than it is to turn them out of court and compel them to begin anew. Ample power has been conferred on the court to pursue such practice by sec. 2836*b,* Stats. 1915 (ch. 219, Laws 1915), if such power did not exist independently of statute.

The plaintiffs' contentions are twofold: (1) that the acts complained of violate the constitutional rights guaranteed to them by sec. 3 of art. X of our constitution, and (2) that they violate the rights guaranteed by sec. 18 of art. I of that instrument.

The provision first referred to reads as follows:

"The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of four and twenty years; and no sectarian instruction shall be allowed therein."

Sec. 18 of art. I provides:

"The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury

for the benefit of religious societies, or religious or theological seminaries."

The two things complained of are the use of a church building in which to hold graduation exercises and the delivery of an invocation or prayer thereat by a denominational clergyman.    The holding of graduation exercises in a church is not in itself the giving of sectarian instruction, within the meaning of sec. 3 of art. X above quoted.    This is obvious, and presently eliminates from consideration the constitutional provision first quoted.    Neither is it shown that the taxpayers were called upon to pay for the use of the churches in which the exercises were held, nor that the clergymen who gave the invocations were paid for doing so.    Such being the case, no one has been called upon against his will to erect or support any place of worship or maintain any ministry, nor has any money been drawn from the treasury for the benefit of a religious society.    A man may feel constrained to enter a house of worship belonging to a different sect from the one with which he affiliates, but if no sectarian services are carried on he is not compelled to worship God contrary to the dictates of his conscience and is not obliged to do so at all. The only clauses of sec. 18 of art. I that are at all applicable to the question under discussion are those which provide that no person shall be *compelled* to attend any place of worship against his consent and which forbid interference with the rights of conscience.    Obviously graduation exercises are a part of the school curriculum and are under the direction and control of school boards.    They may be dispensed with, but so long as they are not, school boards cannot escape responsibility for them.    Parents and pupils of all denominations have a right to attend such exercises without their legal rights being invaded.    It would be far-fetched, however, to say that by so doing they are compelled to attend a place of worship.    True, the building is one ordinarily used for conducting religious services.    Other buildings that are not churches are often used for like purposes.    So are our pub-

lic streets.   Indeed, at the present day, churches are largely used for social gatherings of various kinds at which no religious services of any kind are carried on.   The kind of a building is hardly the significant thing from the legal standpoint, but the fact that worship is carried on when there is actual or moral compulsion.   Graduation exercises take place but once a year.   Often in smaller places church auditoriums are more commodious and better calculated to take care of the overflow crowds that congregate at such times than any other building that is available.   To say that a person attending such place once a year is compelled to attend a place of worship would be giving prominence to form rather than to substance.   When the constitution protects the individual from being compelled to attend a place of worship, it undoubtedly means that he shall not be required to attend a place where religious instruction is being given at the time he is required to be present.   It protects a man from being obliged to attend the services of the Salvation Army in our public streets, or from being compelled to enter a hall or opera house while such services are being carried on, just as much as it does against being forced to enter a church.   It is what is done, not the name of the place where it is done, that is significant.

The fact that certain persons desire to attend graduation exercises with their children, and that they say that being compelled to enter a church of a different denomination from that to which they belong is violative of their assured rights of conscience, does not make it so.   If it is clear that the thing complained of does not violate any right guaranteed by the constitution, then the courts cannot interfere in their behalf, because the final decision on this question must necessarily rest with the courts and not with the individual.   The individual must decide for himself whether his conscience tells him that he must not frequent a certain place.   If it does, he should punctiliously regard its behests and stay away.   But the court cannot turn casuist further than to de-

termine whether a legal right has been invaded in any given case. Neither can it say that a thing offends against conscience when there is no substantial reason why it should. It is not sufficient for a person to say: "This thing is contrary to what my conscience tells me to be right, therefore it must be stopped." The individual cannot foreclose inquiry into the reasonableness of his request by his bare assertion. Some consciences are very tender and very highly developed, so much so that the possessor regards as being wrong many things that the law regards as harmless. Some refrain from playing cards for amusement, some from dancing, some from attending places of amusement, and some from all these things, because they consider it wrong to participate in or countenance them. The law regards none of these things as being essentially wrong in itself. At the same time it recognizes the right of any one to stay away from them where the promptings of conscience indicate that it would be wrong to attend.

To the lay mind there is very little difference in principle between the case before us and *Dorner v. School Dist.* 137 Wis. 147, 118 N. W. 353. There a Catholic parochial school was built adjacent to a Catholic church and some of the school rooms were rented and used for the purposes of a public school. The Catholic school children attended church services before school hours in the morning, and prayers were recited and hymns were sung during school hours in the portion of the school building used for parochial school purposes and in rooms either adjoining or adjacent to those rented by the public school authorities. The parochial school was taught by Sisters clad in the conventional garb of the order to which they belonged. The lower court found that the public school conducted in the parochial school building had at times been pervaded and characterized by sectarian instruction, and very properly enjoined the continuance of such practices. It held, however, that the school board was acting within its legal rights in renting and using a part of the

parochial school building for the purposes of a public school, and such decision was affirmed in this court. There are points of dissimilarity between the two cases, but it would be difficult to say that those who felt aggrieved in the *Dorner Case* did not have at least as strong a ground for complaint as did the plaintiffs in the present case. It is true that the public school was not conducted in the church building and that certain rooms in the parochial school were exclusively devoted to the use of the public school. But it is also true that the school building was one in which sectarian instruction was given and was within the shadow of a church which was attended daily by the children attending the parochial school; that the teachers in such school were clad in a religious garb, and that the public school attendants or many of them were within the hearing of prayers recited aloud in the parochial school rooms, as well as within the hearing of sectarian hymns sung in such rooms. We conclude that the holding of graduation exercises in a church building is not in and of itself contrary to either of the constitutional provisions relied on by the plaintiffs.

A somewhat different question is raised by the complaint about prayers being offered at graduation exercises by denominational clergymen. A prayer may be either sectarian or nonsectarian in character. The sessions of our national Congress, of our state legislature, and of our great party conventions are customarily opened with prayer. These prayers are almost invariably nonsectarian in character, so much so that a person reading them or listening to them would be entirely at a loss to discover to what denomination the clergyman belonged. The enthusiast who places his desire to make proselytes to the faith he professes above his sense of propriety may occasionally "slop over," but it is only just to say that our clergy rarely offend in this regard. To be sure, offense may be very adroitly given if the clergyman is so minded, but there is no claim that any such thing has occurred in this case.

The court decided in the *Edgerton Bible Case* that the giving of a nonsectarian prayer was not sectarian instruction. We quote from the opinion:

"The term 'sectarian instruction,' in the constitution, manifestly refers exclusively to instruction in religious doctrines, and the prohibition is only aimed at such instruction as is sectarian; that is to say, instruction in religious doctrines which are believed by some religious sects and rejected by others. Hence, to teach the existence of a Supreme Being, of infinite wisdom, power, and goodness, and that it is the highest duty of all men to adore, obey, and love Him, is not sectarian, because all religious sects so believe and teach. The instruction becomes sectarian when it goes further, and inculcates doctrine or dogma concerning which the religious sects are in conflict. This we understand to be the meaning of the constitutional prohibition." *State ex rel. Weiss v. District Board*, 76 Wis. 177, 193, 194, 44 N. W. 967.

In the case before us it appears from the allegations of the petition that both Catholic priests and Protestant ministers had at different times been selected to deliver the invocation at graduation exercises. There is no claim that on any of these occasions any unseemly hint or suggestion was made by any of the reverend gentlemen who were so honored. In fact the contrary appears by inference at least. So it is clear that no showing was made that sectarian instruction was given as that term is defined in the case last cited. Had it appeared that the invocations given were sectarian in character and that the school board threatened to continue or permit such practices in the future, we do not wish to be understood as intimating that a court of equity would not enjoin the continuance of such practice.

We think it would be difficult to pick out any clause of sec. 18, art. I, of the constitution which by any fair or reasonable construction could be said to be violated by the delivery of a nonsectarian prayer at a graduation exercise. No man is compelled to worship, nor compelled to attend a place of worship, nor does he, as before stated, attend such a place ex-

cept in the most technical sense when he attends graduation exercises.    Pupils do not congregate .on such an occasion for the purpose of worship, and the short nonsectarian invocation that is usually given is a mere incident which occupies but a few moments of the two hours or more that is usually occupied with the program prepared for such occasions.    If the prayer be nonsectarian it does not interfere with any right of conscience that the law recognizes, and neither is the matter of permitting it the giving of any preference to any religious establishment or religious mode of worship in a constitutional sense.    A very different question would arise if an attempt were made to introduce the practice of having prayer as part of the daily routine in our public schools. Considering what has. been done here and the rare occasions on which it has been or can be done, the matter complained of seems to be too inconsequential to furnish the subject of a lawsuit.    It follows from what has been said that the judg-ment of the lower court was right.

*By the Court.*—Judgment affirmed.