STATE OF NEBRASKA EX REL. SCHOOL DISTRICT OF HARTING-
TON, ALSO KNOWN AS SCHOOL DISTRICT NO. 8, CEDAR
COUNTY, NEBRASKA, APPELLEE, V. NEBRASKA STATE BOARD
OF EDUCATION ET AL., APPELLANTS.

195 N. W. 2d 161

Filed February 25, 1972. No. 37942.

Clarence A. H. Meyer, Attorney General, and Chaun-
cey C. Sheldon, for appellants.

Robert B. Crosby of Crosby, Pansing, Guenzel & Bin-
ning, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH,
McCOWN, NEWTON, and CLINTON, JJ.

BOSLAUGH, J.

This is an action by the School District of Hartington,
Nebraska, to compel the Nebraska State Board of Edu-
cation, and the Nebraska Department of Education, to
approve its application for a grant of federal funds to

(1)

provide instructional activities and services to meet the special educational needs of educationally deprived children. The application, dated September 8, 1969, was made pursuant to the Federal Elementary and Secondary Education Act of 1965.

Because of a shortage of space in the buildings owned by the Hartington School District, the district entered into a lease with the Hartington Cedar Catholic High School for the use of one classroom full time and a second classroom half time. The lease provided that the classrooms would be used only for carrying on the project under the Federal Elementary and Secondary Education Act of 1965; that the Hartington School District would have full control over the classrooms and the educational program; and that no objects, pictures, or other articles having a religious meaning or connotation would be in the classrooms.

The defendants refused to approve the application because the project included the use of leased classrooms in the Hartington Cedar Catholic High School Building. This action followed.

The trial court found generally for the plaintiff and ordered the defendants to approve the application. The defendants appeal. The sole issue presented is whether the lease between the plaintiff and the Hartington Cedar Catholic High School is in violation of the Constitution of the United States and the Constitution of Nebraska. The particular provisions involved are the establishment clause of the First Amendment to the Constitution of the United States, and the prohibition against public aid to any sectarian or denominational school contained in Article VII, section 11, of the Constitution of Nebraska.

The First Amendment to the Constitution of the United States provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

The Constitution of Nebraska provides: "Neither the State Legislature nor any county, city or other pub-

lic corporation, shall ever make any appropriation from any public fund, or grant any public land in aid of any sectarian or denominational school or college, or any educational institution which is not exclusively owned and controlled by the state or a governmental subdivision thereof." Art. VII, § 11, Constitution of Nebraska.

The right of a public school district to use or lease all or a part of a church or other sectarian building for public school purposes has been upheld in a number of cases. As stated by the Supreme Court of Michigan in In re Proposal C, 384 Mich. 390, 185 N. W. 2d 9: "Premises occupied by lease or otherwise for public school purposes under the authority, control and operation of the public school system by public school personnel as a public school open to all eligible to attend a public school are public schools. This is true even though the lessor or grantor is a nonpublic school and even though such premises are contiguous or adjacent to a nonpublic school." See; also, State ex rel. Conway v. District Board, 162 Wis. 482, 156 N. W. 477; Dorner v. School Dist., 137 Wis. 147, 118 N. W. 353; Millard v. Board of Education, 121 Ill. 297, 10 N. E. 669; Scripture v. Burns, 59 Iowa 70, 12 N. W. 760; Swadley v. Haynes (Tenn.), 41 S. W. 1066; Rawlings v. Butler (Ky.), 290 S. W. 2d 801, 60 A. L. R. 2d 285; Crain v. Walker, 222 Ky. 828, 2 S. W. 2d 654; City of New Haven v. Town of Torrington, 132 Conn. 194, 43 A. 2d 455; State ex rel. Johnson v. Boyd, 217 Ind. 348, 28 N. E. 2d 256.

If the property used or leased is under the control of the public school authorities and the instruction offered is secular and nonsectarian, there is no constitutional violation. The lease in this case meets these requirements. We find no "excessive entanglement" between government and religion in the lease involved in this case. See Walz v. Tax Commission, 397 U. S. 664, 90 S. Ct. 1409, 25 L. Ed. 2d 697.

The defendants concede that it is not ipso facto un-

lawful for a public school district to lease property from a church-affiliated organization or institution for public school purposes. They attempt to raise a broader issue and challenge the "general constitutionality of the total educational program here involved." The defendants assert that it is unconstitutional for parochial school children to participate in an educational program under the federal act.

The federal act requires that educationally deprived children within the public school district who are enrolled in private schools be allowed to participate in the program. 20 U. S. C. A., § 241e (a) (2). Section 116.19 (b) of the federal regulations provides that the private school students' participation in the program shall be on a basis comparable to that of the children enrolled in the public schools. The defendants actually seek a declaration that the federal act itself is unconstitutional. See Barrera v. Wheeler, 441 F. 2d 795 (8th Cir.). Although that issue is not presented in this case, we believe it appropriate to make the following observations concerning the contention advanced by the defendants:

The Constitution of Nebraska specifically provides that no religious test or qualification shall be required of any student for admission to any public school. Art. VII, § 11, Constitution of Nebraska. It would seem that an attempt to prohibit a student enrolled in a parochial school from participating in a program conducted by the public schools, solely because the student was enrolled in a parochial school, would violate this provision of the Constitution of Nebraska.

The United States Supreme Court has, in the past, recognized a distinction between aid provided to parochial school students or their parents and aid provided to the school itself. In Everson v. Board of Education, 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711, 168 A. L. R. 1392, public transportation of nonpublic students was held constitutional. In Board of Education v. Allen, 392 U. S. 236, 88 S. Ct. 1923, 20 L. Ed. 2d 1060, the loan of school-

books for parochial school students was approved. In Earley v. DiCenso, 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745, and Robinson v. DiCenso, 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745, payment of a salary supplement to teachers of secular subjects in nonpublic schools was held invalid. In Lemon v. Kurtzman, 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745, reimbursement for teachers' salaries, textbooks, and instructional materials for secular subjects in nonpublic schools was held invalid. In Tilton v. Richardson, decided June 28, 1971, 403 U. S. 672, 91 S. Ct. 2091, 29 L. Ed. 2d 790, Chief Justice Burger stated: "Our cases from Everson to Allen have permitted church-related schools to receive government aid in the form of secular, neutral, or non-ideological services, facilities, or materials that are supplied to all students regardless of the affiliation of the school which they attend." See, also, P.O.A.U. v. Essex, 28 Ohio St. 2d 79, 275 N. E. 2d 603.

The record shows that the classes which would be conducted by the Hartington School District in the leased classrooms would include both students enrolled in the public schools and students enrolled in nonpublic schools. It would seem that to deny a student the right to participate in a program offered by a public school district solely because that student is enrolled in a parochial school would violate that student's right to a free exercise of religion and to equal protection of the law. In re Proposal C, *supra.*

The judgment of the district court is affirmed.

AFFIRMED.

WHITE, C. J., dissenting.

Article VII, section 11, of the Constitution of the State of Nebraska provides: *"Neither the State Legislature nor any county, city or other public corporation, shall ever make any appropriation from any public fund, or grant any public land in aid of any sectarian or denominational school or college, or any educational institution which is not exclusively owned and controlled by the*

*State or a governmental subdivision thereof."* (Emphasis supplied.)

We have before us in this case the issue of whether federal aid extended under Title I of the Elementary and Secondary Education Act (hereinafter referred to as ESEA), Pub. L. 89-10, 79 Stat. 27 (1965), 20 U. S. C. 884 (Supp., 1965), is an impermissible violation in contravention of the above provisions of the Constitution of the State of Nebraska and the First Amendment to the Constitution of the United States. Broadly stated, the issue involved here centers around the historic constitutional requirement that government and religion remain separate, and in particular, whether the Constitution of the United States and the Constitution of the State of Nebraska permit public aid to sectarian schools.

At the outset, it should be made clear that what we are dealing with here is not simply a lease or an arrangement between a public and private school for the use of space or physical equipment in any building. The attempt to diminish or evade the issue before us in this case can be clearly exposed by a recital of how this case arose: Section 205(a), 79 Stat. 30, 31 (1965) states: "A local educational agency may receive a basic grant under this title for any fiscal year only upon application therefor approved by the appropriate State educational agency * * *." In hopes of securing a federal grant, the School District of Hartington, Nebraska, made application to the Director of Title I, ESEA, Nebraska State Department of Education, in the fall of 1969 for a Title I project to instruct qualifying students in remedial reading and remedial mathematics. The application's cover letter begins by stating, "Within our ESEA Title I project for fiscal year 1970, there has been included a Lease Agreement Contract between the Hartington Public School and Cedar Catholic High School of Hartington for facilities in which to conduct our Title I project * * *." The proposed project would have had the qualifying public and private school students attend remedial

reading and mathematics classes in two classrooms located in Cedar Catholic High School. Qualifying public and private school students would attend health and industrial arts classes in the public high school classrooms. Due to a shortage of classrooms in the public schools and the absence of any other practical location for the Title I programs, the School District "incorporated" the lease agreement into their Title I project for 1970.

Upon the appellants' refusal to approve the Hartington project, the School District of Hartington brought a mandamus action in the district court for Lancaster County. The School District sought to compel the appellants to approve the Hartington Title I project. The district court found that "the program for courses in remedial reading and remedial mathematics * * * including the use of leased classroom space for part of said program * * * does not violate the Constitutions of Nebraska, or the United States, and should be approved * * *."

One further word about the precise issue presented in this case. The weakness of appellee's position upon the state-church issue is apparent from the strenuous attempt throughout this litigation to constrict the issue to whether the lease of the physical classroom space from a parochial school is unconstitutional. We do not even need to peer through the form to see the substance of this scheme. It is apparent on the face of it. The lease does not stand alone at any time. It is included, it is true, in the overall Title I project application submitted by the School District, and although the lease was not directly related to the health and industrial arts classes that were to be held within the public school, the lease obviously is an integral part of the entire project. If nothing else, the lease was essential to the operation of the remedial reading and mathematics aspect of the project, and without the need to conduct remedial reading and mathematics classes there was no reason for the lease agreement. The only purpose of the application,

and the only purpose of the scheme, is to channel federal and state appropriated funds into the assistance of the education program of nonpublic schools, hopefully without getting involved in church-state questions. It is enough to say that the drafters of the ESEA in 1965, in attempting to weave their way through the United States Supreme Court's decisions dealing with the church-state issue, have set up a vaguely defined corridor through which funds may be channeled to assist nonpublic schools. For an analysis of this aspect of the act, see, Senate Rep. No. 146, 89th Cong., 1st Sess. (1965); Drinan, Reflections on the Implications of Title I of the Elementary and Secondary Education Act of 1965, 15 Cath. Law 179 (1969); Comment, the Elementary and Secondary Education Act of 1965 and the First Amendment, 41 Ind. L. J. 302 (1966); Feikens, The Elementary and Secondary Education Act - The Implications of the Trust-Fund Theory for the Church-State Questions Raised by Title I, 65 Mich. L. Rev. 1184 (1965).

Federal constitutional questions aside, I do not think it is an over-simplification to simply state that the answer to our problem in this case lies in the clear, unequivocal, unambiguous, and forceful language of our state Constitution. I repeat, it says: "Neither the State Legislature nor any county, city or other public corporation, *shall ever* make *any* appropriation from *any* public fund, or grant any public land *in aid of* any sectarian or denominational *school* or college, or any educational institution which is *not* exclusively owned and controlled by the state or a governmental subdivision thereof." (Emphasis supplied.) These words in our Constitution say what they mean and they mean what they say. They do not draw any distinction between sectarian or secular instruction, they do not permit any shadowy distinctions as to type of instruction, personnel of teachers, or any of the other distinctions and principles sought to be applied in the numerous cases under the First Amendment to the United States Constitution. Unde-

niably the grant of these funds requires state action. The application was to the state agency. ESEA requires specific authorization by the state. The State Board of Education is an arm of the State Legislature. Certainly nobody could argue that the proposed application and grant did not come squarely within the language of the "the State Legislature nor any county, city or other public corporation, *shall ever* make *any* appropriation from *any* public fund, or grant any public land *in aid of any sectarian,* \* \* \*." The crucial fact in this case is the ESEA program, and the application filed herein by the Hartington School District requires a state agency to act and to make an appropriation, regardless of whether the funds are considered state or federal in nature. It is inconceivable to me, that, according to the dictates of Article VII, section 11, of the Constitution of the State of Nebraska, that this act of appropriation directly "in aid of" a sectarian school could be declared constitutional.

The State of Idaho has a constitutional provision almost identical to ours. In Epeldi v. Engelking, 94 Idaho 390, 488 P. 2d 860, the Supreme Court of Idaho, in striking down a provision for bussing parochial students, *under its state constitutional provision,* said as follows: "This section in explicit terms prohibits any appropriation by the legislature or others (county, city, etc.) or payment from any public fund, *anything in aid* of any church or to help support or sustain any sectarian school, etc. By the phraseology and diction of this provision it is our conclusion that the framers of our constitution intended to more positively enunciate the separation between church and state than did the framers of the United States Constitution. Had that not been their intention there would have been no need for this particular provision, because under Idaho Const. art 1, § 3, the exercise and enjoyment of religious faith was guaranteed (comparable to the free exercise of religion guaranteed by the First Amendment of the United States Constitution) and it further provides no person could

be required to *attend* religious services or *support* any particular religion, or pay tithes against his consent (comparable to the establishment clause of the First Amendment).

"The Idaho Const. art. 9, § 5, requires this court to focus its attention on the legislation involved to determine whether it is in 'aid of any church' and whether it is 'to help support or sustain' any church affiliated school. The requirements of this constitutional provision thus eliminate as a test for determination of the constitutionality of the statute, both the 'child benefit' theory discussed in Everson v. Board, supra, and the standard of Board of Education v. Allen, supra, i. e., whether the legislation has a 'secular legislative purpose and a primary effect that neither advances nor inhibits religion.' In this context, while we recognize that even though this legislation does assist the students to attend parochial schools, it also aids those schools by bringing to them those very students for whom the parochial schools were established. Thus, it is our conclusion that this legislation, the effect of which would be to aid the school, is prohibited under the provisions of Idaho Const. Art. 9, § 5."

We need inquire no further. It is clear that the scheme and plan involved in this case goes much further than mere bussing, because it provides for direct payments of money to assist the education of secular or private school students. The overwhelming authority from states with similar state constitutional provisions is to the same effect. See, Matthews v. Quinton, 362 P. 2d 932 (Alaska, 1961); Epeldi v. Engelking, *supra;* Spears v. Honda, 51 Hawaii 1, 449 P. 2d 130 (1969); Opinion of the Justices, 216 A. 2d 668 (Del., 1966); State ex rel. Reynolds v. Nusbaum, 17 Wis. 2d 148, 115 N. W. 2d 761 (1962); Judd v. Board of Education, 278 N. Y. 200, 15 N. E. 2d 576, 118 A. L. R. 789 (1938).

We turn now to the issue, which is before us, under

the First Amendment to the United States Constitution. First, it seems to me that the United States Supreme Court in Lemon v. Kurtzman, 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), had held that the Everson case, permitting school bussing, was the trail's end with regard to what is not aiding in the establishment of religion. In that case, the court pointed out that the "verge" reached in Everson had "become the platform for yet further steps," leading to dangerous developments of federal constitutional theory. In my opinion, the principles and rationale of Lemon v. Kurtzman, *supra*, is decisive of the issue here in the present case. Lemon was a grouping of three state school aid cases, and the Supreme Court applied the "entanglement" test which it had formulated in Walz v. Tax Commission, 397 U. S. 664, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970). The court said: "* * * the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." The court held two statutory school aid plans unconstitutional under the religion clauses of the First Amendment since both plans involved excessive entanglement of church and state even though both promoted secular legislative purposes. The opinion of Chief Justice Burger stressed the divisive political potential of both state programs, "one of the principal evils against which the First Amendment was intented to protect."

I can see no difference, in principle, between the Lemon case and the case we have before us. Although the Lemon case deals with state statutory aid programs to nonpublic schools, it seems clear that the present case is directly analogous, and that the ESEA program with state required action, has the same "self-perpetuating and self-expanding propensities which provide a warning signal against entanglement between government and religion." See Lemon v. Kurtzman, *supra.*

We must remember that the prohibition of religious entanglement under the First Amendment is a two-edged sword. The Supreme Court of the United States spelled this principle out clearly in School District of Abington Township v. Schempp, 374 U. S. 203, 259, 83 S. Ct. 1560, 1591, 10 L. Ed. 2d 844 (1963). What it said is as follows: "* * * government and religion have discreet interests which are mutually best served when each avoids too close a proximity to the other. It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil policy, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government."

It would seem that the question under the federal Constitution involved in this case has been resolved in Sanders v. Johnson, 403 U. S. 955, 91 S. Ct. 2292, 29 L. Ed. 2d 865, where the Supreme Court of the United States, subsequent to the opinion in Lemon, affirmed a lower federal court decision involving a Connecticut state statute authorizing the state to contract with parochial schools for the purchase by the state of secular educational services for the parochial schools. The Supreme Court affirmed the holding of the lower court that such a statute was unconstitutional. The lower federal court, in Johnson v. Sanders, 319 F. Supp. 421 (1970), prior to the decision in Lemon, and apparently anticipating it, said as follows: "The State could not itself maintain an educational establishment providing secular classes closely integrated with religious instruction, symbols, and observances—even if the latter were the sole responsibility of private groups—in the same buildings during regular school hours. * * * even if a state does not itself formally maintain a school which teaches religion or applies sectarian admission standards, a law may specify types of public identification and involvement with such a school which cause an 'excessive government entanglement' with the religious

aspects of the institution, thereby advancing or inhibiting religion. * * * A constitutional funding measure requires not just artful legislative language, but also the creation of an administrative mechanism through which government may restrict its spending to a readily identifiable secular educational function without 'continuing surveillance leading to an impermissible degree of entanglement.' "

In summary, it seems to me, over and beyond the other reasons touched on in this dissent, that this act, this scheme, this procedure requires that the state will be amidst the daily affairs of a religious school. It must be remembered that we are not dealing with something as simple as a bus ride, or a textbook, or a mere lease agreement; we have here an innovative program of noble purpose and it carries with it those highly feared risks of conflict and divisiveness which history has shown follow any close proximity between government and religion.

If this statute, and the state action asked to be taken under it, is constitutionally permissible, then I see no obstruction or impediment to the state and the federal government taking complete and literal control of the contracting schools and making their entire secular curricula part of its public system for all purposes, including the hiring of teachers, the renting of the physical facilities, and perhaps the admission of students. Such action plainly runs afoul of the state and federal Constitutions. We must remember that the real test of constitutionality is not what is actually done under the act but what the act authorizes.

The act and the scheme here, in my opinion, are the beginning of the possible creation of state financed, and therefore extensively state regulated, entanglement in sectarian school affairs. The state, in order to comply with the federal act, is required to set up a "partition" between the secular and religious activities of parochial schools and to take substantial responsibility for

the secular portion of parochial school students' education. I am firmly of the opinion that this runs afoul of the basic principle of the establishment clause test in the federal Constitution that neither the federal government nor the state can engage in legislation or action which advances or inhibits religion.

SPENCER, J., joins in this dissent.

McCOWN, J., concurring.

I concur in the majority opinion. This is not the case in which to belabor unconstitutional church-state bogeymen. This case involves the lease of two classrooms in a parochial school by a public school district for the purpose of conducting classes under a federally funded special education services program for all public or private school pupils having need of it. The dissenting opinion misconceives the law and the facts. The dissent states: "The only purpose of the application, and the only purpose of the scheme, is to channel federal and state appropriated funds into the assistance of the education program of non-public schools * * *." That is simply not so. The special education services provided under the Act involved here are available to pupils of public schools and also to pupils of parochial and other non-profit private schools, and the entire program is under the direct supervision and control of the public school.

The dissent relies heavily upon Sanders v. Johnson, 403 U. S. 955, 91 S. Ct. 2292, 29 L. Ed. 2d 865, in which the Supreme Court of the United States affirmed a federal court decision involving a Connecticut statute. The dissent quotes extensively from the lower federal court case reported at 319 F. Supp. 421. The dissent, however, fails to note that the Johnson case quite clearly approved special education services of the kind involved here. In discussing the previous state policies and programs which the court approved, the court in that case stated: "The State made bus transportation, health and welfare services, and special education services available

to students attending parochial and other non-profit private schools; * * * it was never supposed that these limited state activities constituted public control, endorsement, or 'promotion' of the secular education provided independently by parochial schools. Cf. Board of Education v. Allen, supra; Everson v. Board of Education, supra. The State gave aid to parochial school students and even extended some funds through a program for driver instruction and highway safety administered by their schools; but the only secular education 'promoted' with governmental endorsement was offered by the public schools." The court then stated that the state act it held unconstitutional had "sharply altered" that former relationship between the State of Connecticut and its parochial schools and their students.

The dissent also relies heavily upon the case of Epeldi v. Engelking, 94 Idaho 390, 488 P. 2d 860. It need only be noted that in that case a direct state appropriation under a state statute was involved, and even in that connotation, the case represents a definite minority viewpoint.

The dissent here flatly asserts that the constitutional language of "any appropriation from any public fund * * * in aid of any sectarian or denominational school * * *" neither requires nor permits any interpretation whatever. It then proceeds to interpret it to mean that regardless of the primary public purpose, any appropriation from any public fund which results in or produces a direct or indirect benefit for any non-public educational institution or for its pupils is automatically unconstitutional. This is a distortion of the language and the underlying broad assumption is flatly contradicted by every Supreme Court case to date. If the dissent be correct, the State of Nebraska could not even appropriate funds to purchase or lease equipment or a building from a non-public educational institution for the exclusive use of the public school.

It is interesting to note that the federal act involved

here became law in 1965 by act of Congress. Seven years have now passed, and we are unable to find a single court decision, state or federal, which has yet held that act unconstitutional under the federal or any state constitution. If the opinion expressed in the dissent were to become the opinion of this court, it would be the first time in history for a state court to declare a federal act unconstitutional because the federal funds were channeled through a state controlled distibution agency.

The constitutional issues posed by church-state relationships are complicated and difficult of resolution. Nevertheless, the leasing of classrooms by a public school district from a parochial school for furnishing special education services for both public and parochial school pupils with funds provided by the United States government does not raise those issues.

CLINTON, J., joins in this concurrence.

NEWTON, J., concurring in part and dissenting in part.

I concur in part, and dissent in part, with the majority opinion.

The Elementary and Secondary Education Act of 1965 is an Act of Congress which provides public funds for certain educational purposes. See United States Statutes at Large, Vol. 79, p. 27. The Act, as subsequently amended, will be found in Title 20, U. S. C. A., § 241a et seq. A reading of the Act makes it clear that the funds provided may be allotted *only* to *free public* elementary or secondary schools. This necessarily bars, as recipients, all private and parochial schools. See Title 20, U. S. C. A., § 244 (6B). See, also, § 241e (a) (3), which provides: "* * * that the local educational agency has provided satisfactory assurance that the control of funds provided under this part, and title to property derived therefrom, shall be in a public agency for the uses and purposes provided in this part, and that a public agency will administer such funds and property; * * *."

Section 244 (6) (B), provides: "For purposes of subchapter II of this chapter, the term 'local educational

agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools."

It is clear that the intent of the Act is not to provide funds for private schools but to permit students in private schools to benefit by enrolling in classes conducted by, and under the auspices of, public schools.

There is nothing in the Act which can raise a constitutional question in regard to the appropriation of funds for private or parochial schools.

The only remaining question is in regard to the manner in which it is proposed to use the federal funds in this instance. Insofar as the expenditure of public funds, even though derived from federal sources, by the State, or a governmental subdivision of the State, is concerned, the State Constitution must be complied with. In such case, the manner in which the funds are to be used is pertinent. Services educational in nature, rendered to a sectarian school, are forbidden. On the other hand, services dealing basically with the public health and safety would appear to be legitimate. See In re Proposal C, 384 Mich. 390, 185 N. W. 2d 9.

The entanglement of church and state is, in this instance, minimal in nature. The leasing of property from a sectarian school is not necessarily forbidden. However, if the underlying theory advanced in the majority opinion is pursued to its logical conclusion, the school district could dispose of its public school building and lease sufficient space in the sectarian school to teach *all* secular school subjects. It could then teach these subjects to both public and parochial students, notwithstanding a portion of the building was retained for religious educational purposes. This appears to be di-

18

rectly violative of the principles enunciated in Johnson v. Sanders, 319 F. Supp. 421, affirmed without opinion in 403 U. S. 955, 91 S. Ct. 2292, 29 L. Ed. 2d 865.

WHITE, C. J., and SPENCER, J., responding to concurrence.

The concurring opinion makes the broad statement that the dissenting opinion misconceives the law and the facts. This position is buttressed by nothing more than a broad statement of the purpose of the act and its availability to all students. Whether or not this statement of purpose would save the act from being declared unconstitutional on its face is not the question before us. The problem is what the act actually authorizes and what the application in fact seeks to do. We reiterate, rhetoric aside, that the application seeks State approval and consent to the funding and spending of public tax money to furnish secular educational facilities and instruction to parochial school students within their own parochial school building. It is quite inconceivable to us that such an application, requiring public school teachers to teach parochial school students secular subjects in the confines of a parochial school building, does not raise constitutional questions of the most serious nature. The point is that the constitutionality of any "special educational" program will necessarily depend upon the nature of the particular application and what it seeks to accomplish. In our opinion, the authorization of "pocket schools" as this application and this act envision is contrary to the basic provisions of the Constitution of the State of Nebraska and the federal Constitution with reference to the separation of church and state. The concurring opinion utterly fails to answer the questions of entanglement involved in this scheme and its execution, questions that exist no matter how efficient it may be claimed this program is in promoting the secular education of parochial school children. It utterly fails to answer the argument that the execution of this program in this application under the broad language

of the federal program results in an aid to religion, because it is obvious that the provision for funding and providing instruction and education in secular subjects reduces the education cost and necessarily frees money and benefits for use for the particular religious purposes of the parochial school. We also reiterate our previous position that the law of separation of church and state, erected by our Constitution makers as one of the most fundamental principles of our government, was directed not only at religious penetration or intrusion into public education and the expenditure of public funds, but thrusts equally strong to prevent governmental or state penetration or intrusion into the freedom of parochial schools to conduct their religious program of education free of any restraints, inhibitions, or controls by the state or the federal government.

The concurring opinion also states the Epeldi v. Engelking, 94 Idaho 390, 488 P. 2d 860, "represents a definite minority viewpoint." We feel that this statement simply cannot be supported. Even with respect to the issue of bussing, following the Everson case, the majority of states have rejected Everson and have barred transportation at public expense of children attending nonpublic schools. In Reutter and Hamilton, The Law of Public Education, p. 15 (Foundation Press, 1970), the following statement is made with reference to state court interpretation of state constitutions after Everson: "In subsequent years the highest courts of several states have considered the issue in light of their respective state constitutions. As of the end of 1969, more had rejected than accepted the reasoning of the majority in Everson and had barred transportation at public expense of children attending non-public schools."

It hardly needs repetition that the issue involved in the physical transportation of students is far different than the issue we have before us here, namely, the intrusion of public funds into the actual teaching and instruction of parochial and public school students.

We further call attention to our previous decision in State ex rel. Public School District v. Taylor, 122 Neb. 454, 240 N. W. 573 (1932), where this court was asked to command that public funds be paid over to a parochial high school in Cedar County, Nebraska, which is precisely what is being asked in the case at bar. After finding that the school was obviously parochial and therefore without the definition of a public or common school, this court concluded that our state Constitution, citing Article VII, sections 3 to 9, Article VII, section 11, and Article I, section 4, would not allow the court to "require the state superintendent of public instruction to apportion part of the interest and income from the state common school trust funds to a school *in part* sectarian - a school which is not a common or public school within the meaning of the Constitution." (Italics supplied.) In other words, the court rejected the notion that the use of public funds to teach secular subjects in a sectarian school was constitutional. To sum it up, it seems to us that the opinion of the majority in this case is authorizing the creation of an unconstitutional dual school system. There is no reason to believe that public support of the parochial school in Cedar County will end with one and one-half rooms and the teaching, by public school teachers, of a limited group of "secular" subjects.

It is stated that we have made an incorrect analysis of Johnson v. Sanders, the latest pronouncement on the subject. We note that the dissent mentioned the Johnson case only as it aided in the dissent's analysis of the entanglement issue presented in this case. The criticism from the concurrence does not deal in any nature whatsoever with the entanglement issue and the issue of political divisiveness, issues which we think are fundamental to the disposition of this case. However, in going further, the concurrence does state that the Johnson case "clearly approved special education services of the kind involved here." This statement is simply wrong. The reading of the Johnson opinion shows that the State

of Connecticut did finance "secular education provided independently by parochial schools." Unlike our situation here, there were only a minimum of state regulations as to the operation of the secular courses, and it was not the situation as it is here where there is to be a "pocket" public school within the physical confines of a private school. The defect in the new program which Johnson declared unconstitutional was *exactly* that which we have here, namely, governmental promotion and complete control of secular educational activities *within* private institutions; "The State itself assumes responsibility for providing instruction in certain courses at parochial as well as at public schools." The Johnson opinion, as we have pointed out, exhaustively exposes the entanglement and the political divisiveness of this intermingled situation.

In the Johnson case, the court compared the prior form of state aid to the newly enacted statutory plan, thus presenting the same issue we have here. The distinction between the Johnson case and the case we have here is a hairline at the most. It is this very type of hairline distinction which the thrust of Lemon v. Kurtzman, 403 U. S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), and the other cases seek to forbid. In the Johnson case, it is stated: "The primary effect of the type of 'promotion' prescribed would be much more extensive, transforming a unitary public school system into a dual one which partially incorporates participating private schools as its administrative *appendages*." The divisiveness and the entanglement may be stated as follows: Will a Cedar County Catholic High School become a common school or will we have a dual system, public and "pocket" public?

There is another aspect of the Johnson case which was not previously mentioned in the dissent. The Connecticut statute in question in Johnson provided for the support of "any or all secular instruction at contracting schools." Because of the potential of having the state

administering the entire secular. portion of the private school's instructional program, the court recognized the problem of government's influence being so great that "state action" is created; i.e., the private school becomes an arm of the state and the state can be charged *with the private school's traditional discriminatory practices in admissions.* Apart from that the court in Johnson noted that "it would infringe all taxpayer's First Amendment rights to be assured that their money is not used to sponsor an institution which simultaneously teaches religion or applies selective religious standards." In the case at hand, only a portion of secular instruction is controlled by the state, but coupled with the fact that the state is to have a leasehold interest in the property, the parochial school may become an arm of the state. See Burton v. Wilmington Parking Authority, 365 U. S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45.

In closing this response, we call attention to the recent case of State ex rel. Chambers v. School Dist. No. 10 of Deer Lodge County, 472 P. 2d 1013, a Montana case. This case is almost directly in point with the case at bar. In that case the court held that their state Constitution prohibited public school boards from making levy for, or expending funds for the employment of teachers to teach in a parochial school, following the authority contained in a specific state statute. The state constitutional provision in Montana is almost in haec verba with the one in Nebraska. It states as follows: "Neither the legislative assembly, nor any county, city, town, or school district, or other public corporations, shall ever make directly or indirectly, any appropriation, or pay from any public fund or moneys whatever, or make any grant of lands or other property in aid of any church, or for any sectarian purpose, or to aid in the support of any school, academy, seminary, college, university, or other literary, scientific institution, controlled in whole or in part by any church, sect or denomination whatever."

In striking down the school board levy for the employment of teachers to teach secular subjects in a parochial school, the court said: "The Chief Justice proceeded to point out (Walz v. Tax Commission, 397 U. S. 664, 90 S. Ct. 1409, 25 L. Ed. 2d 697) the dangers of such a course in these words: 'The hazards of churches supporting government are hardly less in their potential than the hazards of governments supporting churches; each relationship carries some involvement rather than the desired insulation and separation. We cannot ignore the instances in history when church support of government led to the kind of involvement we seek to avoid.'" The Montana court, in rejecting the argument that is made in the concurrence here, that our State Constitution is open to interpretation, said as follows: "Returning to Section 8 of Art. XI, it cannot be asserted that this section is ambiguous or indefinite and thereby open to interpretation since it clearly states in no uncertain terms that no school district can directly or indirectly appropriate or pay from public funds to aid the support of any school controlled in whole or in part by any church, sect or denomination. While it was argued to the contrary by the appellants, that such section could be interpreted to support their theory of this case, we cannot accept such argument."