No. 71–1537. NEBRASKA STATE BOARD OF EDUCATION ET AL. v. SCHOOL DISTRICT OF HARTINGTON, AKA SCHOOL DISTRICT No. 8, CEDAR COUNTY. Sup. Ct. Neb. Certiorari denied. 

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MARSHALL concurs, dissenting.

I would grant this petition for certiorari and put the case down for oral argument. It involves alleged violations of the First Amendment which are applicable to the States by reason of the Fourteenth Amendment; and the violations, on the papers before us, seem to me to be of the kind that we struck down in *Lemon* v. *Kurtzman,* 403 U. S. 602.

What happened was this: The school district made application to the State for financial aid in instructing stu-

dents in remedial reading and remedial mathematics. The application stated that the school district was leasing the facilities of the Cedar Catholic High School as a place to conduct this project. The students from both the public school and the private school would attend these classes.

The lease provided that no objects, pictures, or other articles having a religious connotation would be visible in the classroom.

This action was instituted in the Nebraska courts when the state authorities refused to undertake the project. The Supreme Court of Nebraska, by a divided vote, approved the project over the objection that it violated the First Amendment. 188 Neb. 1, 195 N. W. 2d 161. Under the project as approved, state funds will be channeled into this parochial school. In this case, as in *Lemon* v. *Kurtzman,* the State is supplying funds for instruction in parochial schools leading to a degree of entanglement between government and religion which runs counter to our opinions.

If a State can finance two courses in a parochial school, there is no reason and logic why it cannot finance the teaching and learning of an entire curriculum. In *Sanders* v. *Johnson,* 403 U. S. 955, we affirmed a district court decision (319 F. Supp. 421) that held invalid a program whereby the State had contracted with parochial schools for the "purchase" by the State of "secular educational services" to be supplied to the children. The contract in that case is different only in scope and in form from the present one. There is no provision in the lease for surveillance of the use of the premises except for making sure that no objects, pictures, or other articles having a religious connotation are present in the classrooms. Yet, those teaching in a parochial school may be members of that faith or under compelling pressures. In light of the command of the First Amendment, the State

in each case must see that all courses of instruction are confined to the "secular" area and do not trench on religious tenets or doctrine. To police this statutory standard would require the exercise of broad powers of surveillance by the State. As stated by the District Court in the *Sanders* case:

"In the present case, the parochial school function which is funded is the entirety of secular 'instruction' itself. In order to confine assistance to this rather amorphous use, the Act would introduce state supervision into virtually every nook and cranny of a school's administration. Perhaps this is logically necessary. If a conscientious public official is to be certain that tax dollars are spent only for activities which are proper secular subcategories of the school's instruction, he must engage in a program of inspecting and monitoring which even the copious specifications of the Act and its open-ended supplementary regulations only begin to suggest." 319 F. Supp., at 431.

The District Court went on to say:

"[T]he detailed plan which the legislature has enacted to separate, purchase, 'promote,' and regulate the contents of secular instruction goes well beyond a theoretical 'subsidy' and brings the potentiality of mutually-damaging involvement to life. Public officials must investigate curricula, materials, and manner of teaching in detail, case by case; oversee the training of teachers; and audit financial records. By doing so, they might disentangle the last thread of religious doctrine from all secular instruction; but by this very process, they would certainly enmesh the state in continuous conflict with churches over the effectiveness with which governmental investigating and policing machinery would be operated." *Id.*, at 432.

The necessity for surveillance is necessarily implied.*

Denial of certiorari here does not appear consistent with our affirmance of *Sanders*. These considerations lead me to vote to take this case and put it down for oral argument so that the entire plan may be carefully examined against the requirements of the First Amendment.

MR. JUSTICE BRENNAN.

The situation, as I see it, is not that portrayed in my Brother DOUGLAS' dissent. Hartington, Nebraska, is a small town [1] where neither the public nor the parochial schools offered remedial reading and remedial mathe-

---

*That was the view of Chief Justice White, joined by Justice Spencer of the Supreme Court of Nebraska, as stated in his dissenting opinion:

"In summary, it seems to me, over and beyond the other reasons touched on in this dissent, that this act, this scheme, this procedure requires that the state will be amidst the daily affairs of a religious school. It must be remembered that we are not dealing with something as simple as a bus ride, or a textbook, or a mere lease agreement; we have here an innovative program of noble purpose and it carries with it those highly feared risks of conflict and divisiveness which history has shown follow any close proximity between government and religion.

"If this statute, and the state action asked to be taken under it, is constitutionally permissible, then I see no obstruction or impediment to the state and the federal government taking complete and literal control of the contracting schools and making their entire secular curricula part of its public system for all purposes, including the hiring of teachers, the renting of the physical facilities, and perhaps the admission of students. Such action plainly runs afoul of the state and federal Constitutions. We must remember that the real test of constitutionality is not what is actually done under the act but what the act authorizes." 188 Neb. 1, 13, 195 N. W. 2d 161, 168.

[1] The population of Hartington, according to the 1970 census, is 1,581. The Hartington public schools had a total enrollment of 572 pupils during the 1969–1970 school year.

matics courses.[2] The school district decided to avail itself of the benefits of the federally financed courses in such subjects provided under the Federal Elementary and Secondary Education Act of 1965, 79 Stat. 27, and submitted a grant proposal, as required by that Act, adequate to provide the courses for all educationally deprived children within the school district—91 public school and 48 parochial school children. But there was a problem of space because there were no available classrooms in the public schools.[3] There were, however, two unused classrooms in the Hartington Cedar Catholic High School and the school district proposed to lease one classroom full time and the second classroom half time at an annual rent of $200 for the full-time classroom and $100 for the half-time classroom. The lease provided that the classrooms would be used only for carrying on the project under the Federal Elementary and Secondary Education Act of 1965; that the Hartington School District would have full control over the classrooms and the educational programs; and that no objects, pictures, or other articles having a religious meaning or connotation would be in the classrooms. The lease represented the complete extent of the relations between the school district and the parochial school. There is not the slightest suggestion that this was a subterfuge to make a subsidy to the

[2] The lease agreement states that:

"[T]he above described project for said courses does not and will not duplicate or replace, either in whole or in part, any course of study in the present curricula of either the public schools or the private schools in Hartington and its environs . . . ."

[3] The Superintendent of the Hartington Public Schools, in a letter to the State Board of Education, indicated that a consolidation of rural school districts into the Hartington School District had increased total enrollment in Hartington's public schools from 394 students in 1967–1968 to 572 students in 1969–1970. As a consequence, the school district was making preparations to conduct three kindergarten classes in the city auditorium. R. 10.

parochial school, or anything except an arrangement motivated solely by the lack of space in the public schools. Thus, the school district would have no part whatever in the curriculum of the parochial school either by way of subsidy of its costs through financing of teaching or otherwise. The remedial reading and remedial mathematics courses would operate completely independently of that curriculum and of the Catholic school administration. My Brother DOUGLAS relies on *Sanders* v. *Johnson,* 403 U. S. 955 (1971), aff'g 319 F. Supp. 421 (Conn. 1970). The situation there is poles apart from this. That was an undisguised subsidy in the form of "purchasing" "secular educational services" from parochial schools and was patently invalid under our decision in *Lemon* v. *Kurtzman, Earley* v. *DiCenso,* and *Robinson* v. *DiCenso,* 403 U. S. 602 (1971). I have heretofore expressed my view that the First Amendment does not render unconstitutional "every vestige, however slight, of cooperation or accommodation between religion and government." *Abington School District* v. *Schempp,* 374 U. S. 203, 294 (1963) (concurring opinion). The accommodation involved in this case would not trespass beyond permissible bounds. For this reason, I join in denying the petition for certiorari.